THE PEOPLE OF THE STATE OF NEW YORK ex rel. EDGAR KENNY, Appellant, against WILLIAM A. ADAMS, as Warden of the City Prison of the City of New York, Respondent.

Argued November 16, 1943; decided January 20, 1944.

*Harold L. Allen* for appellant. I. The relator has a constitutional right to immunity from this prosecution. (*People* v. *Beale,* 131 Misc. 96; *Dunham* v. *Ottinger,* 243 N. Y. 437; *Hale* v. *Henkel,* 201 U. S. 43; *Brown* v. *Walker,* 161 U. S. 591; *People ex rel. Ferguson* v. *Reardon,* 197 N. Y. 236; *People ex rel. Lewisohn* v. *O'Brien,* 176 N. Y. 253; *Boyd* v. *United States,* 116 U. S. 616.) II. The relator's books were surrendered under legal process accompanied by coercion and threats. (*People* v. *Defore,* 242 N. Y. 13; *People* v. *Adams,* 176 N. Y. 351.) III. The relator seasonably asserted his constitutional rights. (*People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219; *Counselman* v. *Hitchcock,* 142 U. S. 547; *People ex rel. Lewisohn* v. *O'Brien,* 176 N. Y. 253; *United States* v. *Hoyt,* 53 F. 2d 881.)

*Frank S. Hogan*, District Attorney (*Stanley H. Fuld* and *Richard G. Denzer* of counsel), for respondent. I. The Attorney-General's acquisition of the relator's books — the product of an improper seizure — did not accord him immunity from prosecution. Section 359 of the General Business Law accords immunity from prosecution only when evidence is compelled by legal process. (*Dunham* v. *Ottinger*, 243 N. Y. 423; *Matter of Doyle*, 257 N. Y. 244; *People* v. *Anhut*, 162 App. Div. 517, 213 N. Y. 643; *People* v. *Cahill*, 126 App. Div. 391, 193 N. Y. 232; *Heike* v. *United States*, 227 U. S. 131; *State* v. *Carchidi*, 187 Wis. 438; *People* v. *Defore*, 242 N. Y. 13, 270 U. S. 657; *People* v. *Gardner*, 144 N. Y. 119; *People* v. *Richter's Jewelers, Inc.*, 291 N. Y. 161; *People* v. *Adams*, 176 N. Y. 351, 192 U. S. 585; *People* v. *Mayen*, 188 Cal. 237.) II. The relator's books were not obtained by legal process. (*Perry* v. *Lorillard Fire Ins. Co.*, 6 Lans. 201; *Wolf* v. *McKinley*, 65 Minn. 156; *People* v. *Allen*, 246 App. Div. 612; *Matter of Phillips*, 143 App. Div. 522; *United States* v. *Price*, 163 F. 904; *State* v. *Cox*, 87 Ohio St. 313; *United States* v. *Sullivan*, 274 U. S. 259; *Matter of Wilman Agency*, 178 Misc. 549, 264 App. Div. 850; *Brown* v. *United States*, 276 U. S. 134; *Dean* v. *Kochendorfer*, 237 N. Y. 384; *People* v. *Belsky*, 177 Misc. 125.)

Desmond, J. Relator, a stock broker, having been thrice indicted on various counts charging crimes of grand larceny and of conducting a " bucket shop ", sued out this writ of habeas corpus to test the validity of his detention in the City Prison, where he was awaiting trial on the indictments aforesaid. Relator's petition sets out his claim that all the indictments are based on data found by the prosecutor in relator's books of account, which books, asserts relator, were taken from him by the Attorney-General under such circumstances as to confer immunity on relator, under the terms of section 359 of the General Business Law. The District Attorney, appearing for the respondent Prison Warden, maintains that relator has failed to bring himself within the immunity provisions of that statute, which is part of the so-called " Martin Act ". The issues raised by the petition and return were tried at Special Term. At the close of relator's proof, Special Term dismissed the writ, holding that the books had not passed from the possession of relator

to that of the Attorney-General in obedience to any subpœna but that they had been turned over to the Attorney-General by relator to avoid immediate arrest. The Appellate Division affirmed unanimously but granted relator leave to appeal to this court.

According to the testimony relator, arriving one morning at his place of business, was met there by two men who identified themselves as an Assistant Attorney-General of the State of New York and a New York City policeman. The Assistant Attorney-General told relator that he had a subpœna for relator's books of account, handed relator a subpœna and demanded the books. That subpœna looms large in this case. Addressed to relator and signed by the Assistant Attorney-General who presented it, it commanded relator to appear " forthwith " before the Attorney-General at the latter's New York City office and to bring with him to that place his books of account. The subpœna contained also, among other things, a statement that for failure to attend at the time and place appointed, relator would " be deemed guilty of a misdemeanor as provided in the General Business Law and other statutes of the State of New York." Taking relator's testimony as true for present purposes, it is plain that the Assistant Attorney-General presented the " forthwith " subpœna as warrant and justification for his simultaneous oral demand for the immediate delivery up of the books. Relator, expressing his reluctance to surrender his records and his concern as to his legal rights, said that he wanted to talk to his attorney. Failing in an effort to reach his attorney by telephone, and then stating that he would not give up the books till he talked to his attorney, relator was met by renewed demands for the books and by the Assistant Attorney-General's threat that the police officer would arrest relator if he did not hand over the books at once. Again relator telephoned to his lawyer's office. This time he reached his legal adviser and by telephone described his plight to the attorney who informed relator that " they are not entitled to them (the books) ", advised relator to assert his constitutional rights, to refuse to surrender the books and to submit to arrest if necessary. After this telephone talk matters were, at relator's request, held in abeyance until the attorney reached the scene, a little later. Arriving, the lawyer again advised his client to

hold on to the books, but later, being told of the threat of arrest, examined the subpœna, noted that it read "forthwith" and then advised relator "if they are going to arrest you, then give them to them." Relator handed over the books to the Assistant Attorney-General, taking the latter's receipt therefor. Relator's attorney then telephoned to another Assistant Attorney-General who seems to have been the person actually in charge of these procedures and asked the latter to change the return time, fixed by the subpœna, so as to make it returnable at three o'clock that afternoon instead of "forthwith." This request was complied with. The Assistant Attorney-General present at relator's office made appropriate changes in the subpœna, handed the subpœna back to relator and then left the office, taking the books with him. That afternoon, at the Attorney-General's office, the Assistant Attorney-General who had authorized the change in time on the subpœna, held a hearing. Relator, sworn as a witness thereat, testified to his name, address, ownership of the business et cetera, but refused to answer other questions on the ground that answers might incriminate him. At the hearing there was no mention of the books but the next morning relator's attorney served on the Attorney-General a letter demanding that the books be returned. The Assistant Attorney-General in a replying letter dated that same day, wrote that the books were being examined by accountants and that time was needed to complete the audit. The books never were returned and it is not now denied that they contain records of the same transactions between relator and certain of his customers, which are charged in the indictments to have been criminal. On the whole picture, we do not think there is justification for the lower courts' holdings that the acts of the Attorney-General's assistants were a mere trick or ruse to get relator's books by a fraudulent use of a subpoena. We hold that the occurrences at relator's office amounted to this: the Assistant Attorney-General used the "forthwith" subpoena, and relator acted on it, as lawful process calling for the immediate production and surrender of relator's account books. On the same basis we relate the Assistant Attorney-General's threat of arrest to the provisions of section 352 of the General Business Law which section (subdivisions 1 and 4) makes it a misdemeanor for a stockbroker, in the course of one of these "Martin

Act " investigations, to refuse to attend or testify at a hearing when subpœned, *or* to refuse to furnish to the Attorney-General " such other data and information as he may deem relevant ". We are not in accord with the holding of the Special Term Justice that the episode at relator's office shows only an unlawful seizure and not testimonial compulsion, nor do we think that relator's claim of testimonial compulsion, and resulting immunity under the statute, is destroyed by the showing that, at the afternoon hearing at the Attorney-General's office, there was no use of or reference to, relator's books. We think the evidence, necessarily taken as true on the motion to dismiss, bears out relator's contention that he became entitled to immunity under the terms of the statute.

To succeed here, relator had to establish two things: *first,* that the methods by which his books were taken from him amounted not to an unlawful seizure (see *People* v. *Richter's Jewelers, Inc.,* 291 N. Y. 161) but to testimonial compulsion and *second,* that the procedures made use of by the Attorney-General's assistants were such as lead to a grant of immunity under section 359 of the General Business Law. As to testimonial compulsion, we think that *People ex rel. Ferguson* v. *Reardon* (197 N. Y. 236) is sufficient authority that relator was compelled " to submit to an investigation of books and papers kept in his private business, for the purpose of furnishing evidence which might be used against him as a basis for criminal prosecution or suits to recover penalties " (p. 242). In the *Ferguson* case there was no subpœna and no hearing but only a demand made at relator Ferguson's office by an agent of the State Comptroller, for an examination of relator's books to ascertain whether relator had paid taxes on stock transfers. The pertinent statute required that persons like relator Ferguson keep records as to such matters which records were to " be subject to the inspection of the comptroller, or any of his representatives ". The statute there, like section 359 of the General Business Law, made it a misdemeanor to refuse such an inspection. An agent of the Comptroller, armed with a certificate of authority, came to Ferguson's office, demanded access to the books and was refused such access, whereupon Ferguson was proceeded against criminally. Judge Hiscock, holding that an inspection of Ferguson's books would have compelled Ferguson

to testify against himself, wrote: " It seems to me that this kind of an inquisition and the attempt to secure from an individual evidence which may be used to convict him of a crime or to forfeit his property comes well within the principles which have been applied to the interpretation of the Constitution." Some years later, in *People* v. *Defore* (242 N. Y. 13, 27) Judge Cardozo, while noting that the word " witness " is the keyword in the constitutional ban against self-incrimination, wrote that " force accompanied by process aimed against a witness and compelling action on his part " violated the constitutional privilege. The *Ferguson* case, wrote Judge Cardozo, " went upon the theory that the inspection there permitted by a statute was in effect a proceeding for a discovery or an examination before trial." No different label should, we think, be put upon those parts of the " Martin Act " which authorize the Attorney-General to demand any pertinent data or information from a stockbroker and make him guilty of a misdemeanor if he resists. So much for testimonial compulsion.

Answer to the next question, as to immunity, turns on the meaning, under these circumstances, of the immunity grant found in section 359 of the General Business Law. If that enactment makes it a strict requirement for immunity, that there be a demand for the books *at the Attorney-General's hearing,* that relator assert his constitutional privilege *at that hearing,* that the officer conducting the hearing issue to relator *at the hearing* a direction that relator produce his books and that relator *at the hearing* comply with such direction, then relator has not brought himself within the section. But we are not here, we think, cribbed and confined by so literal a reading. The purpose and effect of section 359 is unmistakable. (*Dunham* v. *Ottinger,* 243 N. Y. 423, 438.) So that the sweeping grant of inquisitorial power in the " Martin Act " should not fail for unconstitutionality, it was necessary that its authorization of testimonial compulsion be linked up with a corresponding and equally broad grant of immunity. (See *People ex rel. Lewisohn* v. *O'Brien,* 176 N. Y. 253, 267; *Boyd* v. *United States,* 116 U. S. 616, 639.) We do no violence to section 359 when we read it as conferring a grant of immunity sufficient to offset the deprivation of the privilege. Consider the situation here: an Assistant Attorney-General, armed with a " forthwith "

subpœna signed by himself, but obviously acting under the direction of his superior and in touch with the latter by telephone, so uses the subpœna that the books are produced for his inspection, and removed to the place of hearing. If the return time of the subpœna had not been changed from "forthwith" to three o'clock that afternoon, and if relator and the Assistant Attorney-General had walked together the few city blocks from relator's office to the Attorney-General's office, what difference would it have made whether relator or the Assistant Attorney-General carried the books? What essential difference does it make that relator's counsel delivered the written demand for the return of the books, to the hearing officer on the morning after the hearing, instead of handing it up at the hearing? We think any such differences are insubstantial and determinative of nothing when an alleged deprivation of fundamental constitutional rights is under scrutiny. (See *People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219, 227.)

This is not a case where immunity results unexpectedly and unfortunately from an ill-advised action of a zealous but insufficiently informed peace officer. This is a case of duly authorized assistants to the Attorney-General, lawyers, seeking information deemed by them important and procuring it by the use of a subpœna. It is to be presumed that they knew the terms of the statutes and that they understood and weighed the consequences of their acts. Those consequences cannot now be escaped.

The orders should be reversed and the matter remitted for a new hearing, without costs.

LEHMAN, Ch. J. (dissenting). The relator was arrested upon a bench warrant issued by the Court of General Sessions under three indictments charging him with keeping and conducting a "bucket-shop," with grand larceny and with hypothecation of customers' securities and other kindred offenses. Claiming that under section 359 of the General Business Law he had received immunity from prosecution upon the charges contained in the indictments, the relator by a writ of habeas corpus challenges the right of the State to try him upon these charges. At the hearing upon the writ the relator produced evidence intended to establish his claim of immunity. When the attorney

for the relator rested, the District Attorney stated: " I do not concede the facts as testified to; I have witnesses here, and I do not waive the right to call these witnesses, but at this time I ask that the writ be dismissed on the ground that " the relator " has failed to make out a case which comes under the immunity section of the General Business Law, Section 359." The Justice at Special Term granted the motion of the District Attorney, and the Appellate Division has unanimously affirmed the order of Special Term dismissing the writ. The question presented upon this appeal is whether the relator's evidence, which we must assume to be true, establishes the claim to immunity as matter of law.

The relator and an employee of the relator were the only witnesses at the hearing. Judge DESMOND in his opinion has given a summary of their testimony. I read the testimony differently and I prefer to quote verbatim those parts of the testimony which to me seem significant. That is not, however, the sole ground of our difference of opinion. The facts even as stated in the opinion of Judge DESMOND would not, in my opinion, justify the conclusion that the relator had established immunity from prosecution under the indictment. The court is about to " hold that the occurrences at relator's office amounted to this: The Assistant Attorney-General used the ' forthwith ' subpœna, and relator acted on it as lawful process calling for the immediate production and surrender of relator's account books." I find no support in the record for this conclusion. On the contrary it appears from the testimony, hereafter quoted verbatim, that not only was the relator accorded opportunity to consult counsel before he surrendered the books, but was advised by the Attorney-General that " you are required by that subpœna to come to the Attorney-General's office with your books " and he was threatened with arrest only if he refused to comply with the requirements of the subpœna forthwith to " come to the Attorney-General's office with the books," or if he did not deliver the books to the Assistant Attorney-General.

On the morning of October 17th, Mr. Loehr, an Assistant Attorney-General of the State, accompanied by a man in plain clothes, later identified as a police officer, came to the office of the relator and said to the relator: " I have a subpœna for your

books, we want your books ", and at the same time he handed to the relator a subpœna which commanded him to " appear and attend before John J. Bennett, Jr., Attorney General of the State of New York * * * *forthwith* * * * at New York State Building, 80 Centre Street, New York, N. Y., 4th floor, to testify what you * * * may know in regard to matters relating to the practices of ........ and others in the issuance, negotiation and sale of securities in and from the State of New York and bring with you the following books and papers, which the Attorney General deems relevant and material to the inquiry: Account and files of Ruby O. Smith, Customers' ledger, cash book, copy of bank record and cancelled checks and *for failure to attend,* you will be deemed guilty of a misdemeanor as provided in the General Business Law and other statutes of the State of New York." (Italics throughout this opinion are mine. These words are not italicized in the subpœna which was served.)

The relator testified that when the Assistant Attorney-General handed him the subpœna: " I said, ' Well, I'm sorry, I do not know what this is about, or I do know what this is about, I do not know about the books; I'd like to talk to my attorney.' And he said, ' Well, where do you keep your books? ' So I said, ' They are in the safe.' And he said, ' All right, open it up ', and I said, ' All right,' went over and opened the safe and he came along with me, and he said, ' I want your blotter, purchase and sales book ' and named two or three of the ordinary brokerage books, so I said, ' Well, we don't have all of those,' and I reached in and got some, and he reached in and began to take some books out, and I said, ' There were a lot of books in here, that are very old, very old timers,' and I took, finally took four or five books out and laid them on a desk, and he went right over to the safe, took two or three out, and said, ' What's this, what's this? ' And I said, ' You can look at them, they haven't anything to do with it; they are old things that have been around here for a long while, but you can look at them.' So I laid the books down on the desk, and I said, ' Well, now, I do not know whether you are entitled to these books, I do not want to give you these books, they are my books, they belong to me, and I'm not going to let you have them unless I know—'

" The Court: Unless you know what?

" A. ' Unless I know what I'm doing; I'd like to talk to my attorneys.' And he said, ' Well, we've got to have these books,' and I said, ' Well, I do not know about that; wait a little while, and I'll try to get my attorney on the telephone, and then I'll tell you whether I'll give you the books or not.' He said, ' Well, you've got to give us the books; you see the subpœna, and you see we've got to have the books,' and I said, ' Well, it might be, but I won't know; this is a legal matter, and I'm not a lawyer, and I'm not going to give you the books; you'll use them against me.' "

I note here that while the relator had from the beginning tried to find an excuse for not giving up the books ... saying at first that he did not know " what this is about " and that he wanted to see his lawyer and claiming thereafter that he did not have the books, nothing in his testimony until that point indicates even vaguely that he intended to refuse to produce the books because they might tend to incriminate him. I note, too, that no objection was made by Mr. Loehr when the relator said he wished to telephone to his attorney. In the testimony, at least up to this point, I find no words ascribed to the Assistant Attorney-General which unequivocally voice an unlawful demand that the relator should immediately deliver the books to him or to the police officer at the relator's office, rather than a lawful demand that in *obedience to the subpœna* the relator should produce the books " forthwith " at an inquiry held by the Attorney-General at the place designated in the subpœna: Such words as " Well, you've got to give us the books; *you see the subpœna* and *you see we've got to have the books* " seem to me to give scant support indeed for the conclusion set forth in the prevailing opinion that " the Assistant Attorney General presented the ' forthwith ' subpœna as warrant and justification for his simultaneous oral demand for the immediate delivery up of the books."

Perhaps it is of little consequence whether at that time the relator was threatened with arrest if he refused to bring the books " forthwith " to the inquiry in obedience to the subpœna or was threatened with arrest if he did not deliver them immediately to the police officer, for concededly the relator was permitted to telephone to his attorney, and no effort was made to compel him either to deliver the books immediately to the **police**

officer, or even to compel him to bring them forthwith to the inquiry, until after the attorney, in response to a telephone conversation, had arrived at the relator's office and had advised the relator to give up the books.

I quote now the testimony of the relator in reply to questions of his attorney in regard to the telephone conversation which they had on the morning of October 17th: '' I said, ' There are two gentlemen from the attorney's (sic) office here, and they want my books,' and you said, ' Don't give them to them, assert your Constitutional right, they are not entitled to them ' and ' Well,' I said, ' that is all right ', but you said, ' Don't give them to them unless they threaten to arrest you, unless they arrest you, let them arrest you ', that is what you said. ' Well,' I said, ' that is all right, but they *have* threatened to arrest me *already,*' and you said ' Let them,' and I said, ' Well, that is all right.' * * * You said, ' Assert your Constitutional right, and don't give them to them.' '' Perhaps it is not entirely without significance that the relator was advised by his attorney to '' assert your Constitutional right,'' though it does not appear that the attorney at that time had been informed that the books of the relator contained any evidence which would tend to incriminate him. At that time, too, the relator was advised as to the course he should take *if threatened with arrest,* though it does not appear why the attorney should suppose that an Assistant Attorney-General might threaten to arrest the relator, at least unless the relator *refused to obey the subpœna.*

Informed by the relator of the advice he had received from his attorney, the Assistant Attorney-General and the police officer consented to wait until the attorney arrived, though meanwhile they wrapped up the books. Again I quote from the relator's testimony, the story of what occurred *after* relator's attorney arrived and had been informed by the relator that '' they are going to arrest me, they are taking me along now.' You said, ' Well, all right, it is up to you, if they are going to arrest you, then give them to them.' And I said, ' Well, all right, if I've got to give them to them,' and you said, ' All right; let me see that subpœna.' And I had it in my hand, or my pocket, and I handed it to you, and you said, ' This is forthwith.' And I said, ' Yes, I know it.' And you said, ' All right, if you are going to

arrest him, *you've got to take him down to the Old Slip Station.'*
You had a conversation with the police officer, and you said,
*' Don't take him to the Attorney General's office, take him down
to the Old Slip Station.'* And you talked a lot about Mr. Cordes,
the detective, having had some difficulty over booking a prisoner,
and he, the police officer said, ' Oh, I'll book him all right,' but
then in the meantime you said, ' Well, all right,' I said, ' Well,
let him have — if they will let me stay.' You said, ' Very
well, all right; just a minute, I want to talk to Mr. McCall. I
cannot go up, up with you now; I'll call Mr. McCall and see
whether I can have this changed to late this afternoon.' So you
went over to my telephone and picked it up — no, Mr. Lohr
said, you said to Mr. Lohr, ' Whom do you represent? ' or
' Whom are you from in the Attorney General's office? ' And
Mr. Lohr said, ' From Mr. Ambrose McCall.' And you said,
' Well, I know Mr. McCall; will you call him up? ' *Or he volun-
teered.* At any rate, Mr. Lohr called up Mr. McCall and said,
' Mr. Allen would like to speak to you.' He said, ' I'm down
here at Edgar Kenny & Company,' and you spoke to Mr. McCall
on the phone and said, ' I cannot get up at five o'clock,' you
cannot wait down here. Q. That was a request for an adjourn-
ment, during which that conversation was had? A. Yes. Q.
Upon my part? A. Yes. Q. And who was it, was Mr. Lohr
standing at the telephone at that time? A. Yes. Q. Now, what
was the conversation on my part that you heard in the presence
of Mr. Lohr, as you recall? A. You said, ' *Ambrose, I cannot get
up there, they've got the books. I cannot get up there with Mr.
Kenny and the books right now,* and I'd like to make it later in
the day, I'm busy right now.' You said, ' Well, how about five
o'clock? I'm busy all afternoon.' There must have been some
conversation. At any rate you said, ' Three o'clock will be all
right.' Then you turned to Mr. Lohr, and said, ' Mr. McCall
said three o'clock is all right,' and put Lohr on the phone, and
he spoke to Mr. McCall, and said, ' You were talking to Mr.
Allen; he doesn't want to get up there right away.' Q. Well,
after that conversation — A. And then he said, ' All right,
I'll make it three o'clock.' Lohr took the subpœna and marked
that ' forthwith ' and marked ' Three o'clock,' and you asked
him to issue a short receipt.'' The subpœna was changed from
'' forthwith '' to three o'clock in the afternoon.

Isolated fragments of the testimony, at best equivocal, which I have quoted, are construed as a direction for immediate delivery of the books under the threat of arrest. The statute does not prescribe process and penalties to compel such immediate delivery, and the subpœna did not command immediate delivery. The relator's answers to questions put to him on his cross-examination make it perfectly plain that he understood that demand upon him for immediate delivery of the books was made, if at all, only as an alternative, if the relator refused to obey the command of your subpœna to bring the books " forthwith " to an inquiry at 80 Centre Street: "Q. And didn't they tell you that you had to go down to 80 Centre Street, and take your books with you? A. No, they said that '*if you give us the books, you don't have to go along at this time.*' * * * Q. Do you still say that the assistant Attorney General or the police officer did not tell you that you had to go down to the Attorney General's office with the books? A. He said, 'We want the books,' and '*You are required by that subpœna to come to the Attorney General's office with your books,*' and I read the subpœna, and he pointed out to me, 'and it says, "forthwith,"' and I said, 'Yes, I see that.' And I said, 'But, nevertheless,' after I had talked to my attorney, I said, 'Well, you know what he said, I repeated to you what he said now, that you are not entitled to the books and don't give them, and assert your constitutional rights,' and they replied, 'We will arrest you.' Q. That was all they told you, that you had to go down to the Attorney General's office with the books? A. They said, 'We want both, *or you are obliged to come to the Attorney General's office with the books*; now we will take the books.' "

Surely when the relator's attorney advised the relator to submit to a threat of arrest he should have known that neither under the subpœna nor under the statute would a demand be justified for the production of the books at any place other than the office of the Attorney-General and should have known, too, that the relator would not be guilty of a misdemeanor unless he refused to give up the books at the direction of the officer holding an inquiry there.

Pursuant to the altered subpœna the relator and his attorney Mr. Allen appeared at the inquiry held at three P. M., in accordance with the request of the relator's attorney. The relator

introduced the minutes of that inquiry in evidence. After relator answered a few preliminary questions, his attorney stated that " the witness refuses to answer these questions and avails himself of his constitutional rights not to incriminate himself in these proceedings." The witness then refused to answer further questions, and was *not* directed to do so. Again I quote from the record: " By Mr. Allen: I want to say Mr. McCall that I would like at this time to reserve the right to withdraw my objection and to so advise my client at any suggested adjourned examination. By Mr. McCall: But right now you are advising him not to answer any further questions? A. Yes. Q. And you refuse to answer any further questions at this time? A. Yes. By Mr. Allen: I would like to have a short adjournment until Friday of this week in order that I can examine into the circumstances of this case and prepare myself with proper representation of my client's interest. *After making that examination and it has become possible I will give you a full, frank disclosure of the entire situation.*" This ajournment was granted.

The next morning the following letter was delivered to Mr. McCall:

" October 17, 1938.

Ambrose McCall, Esq.
Assistant Attorney General,
State Building,
New York City, N. Y.

Dear Mr. McCall:

In line with my advice to my client, Mr. Edgar Kenny given at the hearing this afternoon to refuse to testify concerning the matter under inquiry, and advising him to assert his constitutional rights, will you please return the books for which your assistant receipted this morning.

In making this request, I want to reserve my right as on the record this afternoon, to produce the books in compliance with the subpœna on the adjourned date, if my further investigation into the circumstances should lead me to change my advice to my client.

The bearer is authorized to give you a receipt for the same,

Very truly yours,

HAROLD L. ALLEN."

and he answered as follows:
" John J. Bennett, Jr.
    Attorney General

STATE OF NEW YORK
DEPARTMENT OF LAW
State Office Building
80 Centre Street
New York City
Telephone: Cortlandt 7-9800

October 18th, 1938

In Reply Refer to
Bureau of Securities.

Harold Allen, Esq.,
70 Pine Street,
New York City.

Dear Mr. Allen:

I am in receipt of your letter of October 17th requesting the return of the books of Edgar Kenny & Company.

These books are presently being examined by accountants of the Attorney General's office and I will have to request that you give me sufficient time to complete our audit.

Yours very truly,
JOHN J. BENNETT, JR.
Attorney General

By Ambrose V. McCall
Assistant Attorney General
in Charge "

This relator did not protest, nor did he appear at the adjourned hearing. Why should he? His attorney had built up his claim of immunity!

Freedom from compulsion to self-incrimination is one of the traditional rights of free men recognized and developed by the common law and guaranteed by the Constitution of the State of New York: " No person shall be * * * compelled in any criminal case to be a witness against himself ". (Art. I, § 6.) The freedom from testimonial compulsion so guaranteed by the Constitution may not be destroyed or abridged by the Legislature. Such freedom from testimonial compulsion extends throughout the field in which there is any peril of prosecution

in a "criminal case" against the witness, but no further. Within the field where freedom from compulsion is guaranteed by the Constitution, it is the privilege of every person—be he innocent or guilty, virtuous or depraved—to refuse to give testimony or to produce evidence that might tend to implicate him in a crime. He has no such privilege where "by some act of amnesty or indemnity or some valid resolution equivalent thereto, he has been relieved from the risk of prosecution for any felony or misdemeanor that his testimony may reveal." (*Matter of Doyle,* 257 N. Y. 244, 250.) Submission by a person to testimonial compulsion exercised in violation of the Constitution by a public officer or even by a court or by the Legislature, does not in the absence of a statute confer upon the witness immunity from prosecution. Other, though perhaps less effective, remedy must be invoked for such violation. The Legislature may, however, "force disclosure from unwilling lips" where it grants "immunity * * * so broad that the risk of prosecution is ended altogether", after such disclosure is forced. In that manner, and only in that manner may the scope of the privilege be abridged. (*Matter of Doyle, supra,* p. 251.)

The Legislature has provided that whenever the Attorney-General "believes it to be in the public interest that an investigation be made" of alleged "fraudulent practices in respect to stocks, bonds and other securities" he may make such investigations as he may deem necessary in connection with the matter. "The attorney-general, his deputy or other officer designated by him is empowered to subpœna witness * * * and require the production of any books or papers which he deems relevant or material to the inquiry." (General Business Law, § 352, subd. 2.) "If a person subpœnaed to attend such inquiry fails to obey the command of a subpœna without reasonable cause * * * or to answer a question or to produce a book or paper when ordered so to do by the officer conducting such inquiry * * * he shall be guilty of a misdemeanor." (§ 352, subd. 4.)

This court has said that where "a statute under the process and penalties prescribed could compel a person to submit to an investigation of books and papers kept in his private business for the purpose of furnishing evidence which might be used against him as a basis for criminal prosecution or suits to

recover penalties," there is compulsion upon such person to become a witness against himself though the " investigation " of such books authorized by the statute is made by an executive rather than a judicial officer authorized to hold a hearing. (*People ex rel. Ferguson* v. *Reardon,* 197 N. Y. 236.) Here, however, though there is statutory compulsion to obey the command of the subpœna to " attend such inquiry," yet since, under the statute, a person attending the inquiry does not become guilty of a misdemeanor by failing to answer a question or produce a book *until " ordered so to do by the officer conducting such inquiry "* the statute, " under the process and penalties prescribed " does not, until such order is given *by the officer conducting the inquiry,* compel a person to become a witness against himself. The explanation of the *Ferguson* decision in the subsequent opinion of this court in *People* v. *Defore* (242 N. Y. 13, 27), shows plainly that what was said and decided in the *Ferguson* case can have no application to this case.

The Legislature is, like the courts, under a duty to vindicate the rights of the individual guaranteed by the Constitution. It cannot and has not attempted to authorize the " officer conducting such inquiry " to compel a person to produce books which might be used against him in a criminal case. The Legislature has, however, recognized that the public interest may be promoted in some cases by granting to a reluctant witness, who claims his constitutional privilege, an immunity as broad as the privilege claimed. Such claims of privilege are at times advanced by a recalcitrant witness for the protection of others rather than the protection of the witness, and if the person conducting the inquiry cannot grant immunity to a reluctant witness, it might, at times be impossible to obtain evidence required to bring to justice others who may have played more important parts in suspected crime than the witness. (Cf. *People ex rel. Falk* v. *Sheriff of New York County,* 258 N. Y. 437.) Accordingly, the Legislature in this and other statutes has given to a public prosecutor or to an officer exercising judicial or quasi-judicial functions a broad discretion whether or not he will grant immunity to a recalcitrant witness. The relator's claim of immunity is valid only if he has shown that the officer authorized to grant immunity has done so in accordance with the statute and after opportunity for the exercise of his discretion.

The statute provides: " Section 359. *Immunity* If any person shall ask to be excused from testifying or producing any book, paper or other document before the attorney-general or his deputy, or other officer designated by him, or before any court, or magistrate, or referee, upon any trial, investigation or proceeding initiated by the attorney general, district attorney, grand jury or court pursuant to the provisions of this article upon the ground or for the reason that the testimony or evidence, documentary or otherwise required of him may tend to incriminate him or to convict him of a crime or to subject him to a penalty or forfeiture, and shall notwithstanding be directed by the court, referee, magistrate or officer conducting the inquiry to testify or to produce such book, paper or document, he must none the less comply with such direction but in such event he shall not thereafter be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, pursuant thereto and no testimony so given or produced shall be received against him upon any criminal action, suit or proceeding, investigation, inquisition or inquiry."

Here concededly the books were delivered to an Assistant Attorney-General at the relator's office and not at the " inquiry " at which the relator had been commanded by the subpœna to attend and to bring with him books and papers. Concededly Ambrose V. McCall, Esq., was the Assistant Attorney-General in charge of the Bureau of Securities in the office of the Attorney-General; concededly he was the " deputy or other officer " designated by the Attorney-General in accordance with the statute to hold the inquiry; concededly Mr. McCall, informed by relator's attorney that he could not " get up there with Mr. Kenny *and the books right now,*" granted the attorney's request to change the time of the hearing; concededly Mr. McCall was not informed that the relator had already been compelled to deliver the books though he had claimed his constitutional privilege; concededly when the relator at the hearing refused to answer questions on the ground that they might incriminate him he was not directed to answer them; concededly, before that time and without a direction from Mr. McCall the relator upon the advice of his attorney had delivered the books

to another Assistant Attorney-General, and concededly neither the relator nor his attorney demanded at the hearing that they be returned to the relator.

The statute authorizes assistants of the Attorney-General to *seek* by the use of a subpœna information deemed by them to be important upon an investigation held by the Attorney-General or an officer designated by him. An assistant of the Attorney-General acting under statutory authority served the subpœna. The same statute which authorizes assistants of the Attorney-General to seek such information in that manner provides that if the person served with the subpœna refuses to produce the information on the ground that it would incriminate him, such person can be compelled to give testimony or produce testimony only by the direction of the officer holding the inquiry, and only where the officer *authorized to give* such direction compels its production does the person producing the evidence obtain immunity. Under the provisions of the statute no person, though acting under the advice of counsel, can gain immunity except by the unequivocal direction of the officer authorized to conduct the inquiry who alone can decide whether immunity is too high a price for the information which is sought. Mr. Ambrose V. McCall was the person so authorized here and the relator's attorney knew that, yet he advised the relator to deliver up the books to the person serving the subpœna under threat of arrest made by *them* without waiting for the direction of Mr. McCall though both the relator and his counsel knew that the relator could not be arrested if the relator were willing to obey the command of the subpœna.

I agree with the majority of the court that " This is not a case where immunity results unexpectedly and unfortunately from an ill-advised action of a zealous but insufficiently informed peace officer." Under the decision which the court is about to make, immunity will, I think, result solely from the action of the relator taken upon the advice of his attorney, intent upon obtaining immunity for his client from prosecution for a criminal offense. No question is here presented concerning the " fundamental constitutional rights " of the relator. His right to refuse to produce the books unless directed to do so by the officer holding the inquiry has never been challenged. He claims immunity because under advice of counsel he submitted to a threat of

arrest which his counsel knew was unlawful. The belated request of counsel for the return of the books and reply of the officer holding the inquiry asking for time must be read in the light of the statement, made by relator's counsel the day before at the hearing, requesting an adjournment in order to examine the circumstances of the case and to determine whether or not to make " a full, frank disclosure of the entire situation." By this decision the only right which the court is vindicating is the right of counsel to endeavor to obtain immunity for a client.

LOUGHRAN, RIPPEY, CONWAY and THACHER, JJ., concur with DESMOND, J.; LEHMAN, Ch. J., dissents in opinion in which LEWIS, J., concurs.

Orders reversed, etc.