**UNITED STATES** of America, Appellee,

v.

Stewart B. **HOPPS**, Appellant.

No. 8976.

United States Court of Appeals Fourth Circuit.

Argued Nov. 4, 1963.

Decided April 2, 1964.

**334**

Edward P. Morgan, Washington, D. C. (Herbert E. Forrest and Edward S. O'Neill, Welch, Mott & Morgan, Washington, D. C., and Thomas J. Kenney, Baltimore, Md., on brief), for appellant.

Joseph D. Tydings, U. S. Atty., and J. Hardin Marion, III, Asst. U. S. Atty., for appellee.

Before BELL, Circuit Judge, and BUTZNER, District Judge.

BUTZNER, District Judge:

Stewart B. Hopps appeals from a judgment of conviction entered upon the verdict of a jury finding him guilty of two counts of an indictment which charged him with use of the mails in a scheme to defraud in violation of 18 U.S.C. § 1341.[1] His grounds for reversal are the insufficiency of the evidence to establish his guilt, error in the District's Judge's charge to the jury, and the denial of motions to suppress evidence which was seized without a search warrant. We affirm the judgment of conviction.

The indictment alleges that as a part of a scheme to defraud, Hopps caused a brochure describing the International Guaranty and Insurance Company to be delivered by mail to the Insurance Commissioner and to the Better Business Bureau in Baltimore, Maryland. The indictment charges the brochure falsely and fraudulently described the company with respect to its reinsurance facilities and the assets listed in its balance sheet. Stocks and bonds included among the assets, the indictment charged, were valueless securities of four companies Hopps caused to be chartered in Panama. Cash and funds due to the company were also charged to be falsely stated.

The District Judge charged the jury that the evidence was insufficient to convict Hopps with respect to the allegations pertaining to the reinsurance facilities and to cash and funds due to the company. He also charged that the evidence concerning reinsurance contracts should be considered only on the issue of Hopps' willfulness. Thus, the only misrepresentations submitted to the jury concerned the stocks and bonds listed as assets.

**I.**

Hopps challenged the sufficiency of the evidence by motion for judgment of acquittal and post-conviction motions. He argues that the verdict rests on inferences insufficient to sustain conviction, and further that the inferences were contravened by substantial evidence. Our reading of the record leads us to believe that the District Court and the jury were

---

1. 18 U.S.C., § 1341. Frauds and swindles.
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.".

not as tightly circumscribed as Hopps urges. The evidence supports the jury's verdict.

Hopps had broad experience in the insurance business, particularly in the field of reinsurance. He recognized that insurance of savings and loan companies would provide a large and lucrative business. In order to furnish insurance facilities he used a small company chartered in Tangier named West Indische Herverzckering Maatschappij. Hopps arranged for the sale of this company to several American investors. He did not directly acquire any stock and he was not an officer of the company. His principal activity was advisor or consultant. The name of the company was changed to International Guaranty and Insurance Company in November 1957.

In his role as advisor, Hopps pervaded the affairs of International. Although its legal home office was nominally in Tangier in the banking house of Mars Et Cie, little business was transacted there. Hopps, operating in the United States, dictated letters and documents for the signatures of many persons. He prepared letters addressed to Mr. J. Rene Mars in Tangier, and then dictated the answer from Mr. Mars. For this purpose he maintained two typewriters. The old one was used to write the letter from Mr. Mars and an electric machine was used to write from the United States ostensibly to Mr. Mars. To perfect the deception, the ribbon copies of letters originating in the United States to Mars were destroyed and only carbon copies were kept in the office files.

Numerous letters and documents were prepared for the signature of E. S. Van Galder, who was cast in the role of an international banker and administrateur of the company. None of the many witnesses who testified in the case ever saw or talked with Van Galder. Hopps dictated Van Galder's letters and prepared documents for his signature. At Hopps' direction, Van Galder's name was signed to the letters and documents by Hopps' son or secretary.

An investigation made by a prospective American investor in Tangier yielded scant knowledge of the company. The impression of foreign control of the company, upon which Hopps relied in part for his defense, was a fiction created by Hopps' activities in the United States.

In November 1957 Hopps arranged for the preparation of a statement of the financial condition of the company as of September 30, 1957, which was filed with the Insurance Commissioner of the State of Nevada. Included among the assets were 5% bonds of Finance Republique S.A., with a market value of $501,610.00. The statement listed as additional assets 125 shares of Instituto Azeca de Creditos y Trust, Pref. (5¾%) stock with the market value of $174,803.75; 140 shares of Cie Intereuropean de Navigacion, Pref. (5½%) stock with a market value of $206,710.00; and 140 shares of Cie Centrala du Gas, Pref. (5½%) stock with a market value of $201,266.68.

The statement represented that the stocks had been acquired from a predecessor company and set out in detail in dividends received in 1955, 1956 and 1957. The statement was prepared by a bookkeeper employed by Hopps. The bookkeeper received the cost data concerning the stocks and bonds from Hopps' son and the information concerning market value and dividends from Hopps.

From the evidence the jury could find that the companies whose stocks and bonds were listed on the September 30, 1957 balance sheet were not then in existence. In November 1957 Hopps directed that a letter bearing the signature of E. S. Van Galder be delivered to a New York attorney. The letter requested the attorney to incorporate three of the corporations in Panama. Shortly thereafter directions were given to incorporate the fourth company. The corporations had the same directors, two of whom were employees or associates of Hopps and the third a stenographer in a New York law office. The directors attended no meetings and did not authorize the issuance of stocks or bonds. The companies did

business neither in Panama nor the United States. Hopps paid for their incorporation and was reimbursed by International.

In the early part of 1958, Hopps and his associates became aware of apprehension in the insurance industry generally concerning insurance of domestic savings and loan associations by foreign companies. In addition, a complaint was received concerning an association which was insured by International. Hopps' first inclination was to ignore the criticism and to solve the specific complaint by cancelling the policy that related to it. His associates, however, believed that the inquiries should be answered. Accordingly a brochure was prepared for wide circulation in the United States. Hopps supplied an abbreviated balance sheet of International as of December 31, 1957 for the brochure. The names of the companies issuing stocks and bonds which were included among the assets of International were not listed in the brochure. Hopps dictated for the signature of an officer of the company the letters transmitting the brochure by mail to addressees in Maryland.

The District Judge charged the jury that Hopps could be convicted only upon proof that the stocks and bonds were worthless, "not worth the paper they were written on". Hopps contends the jury could make such a finding only by a progression of inferences that were insufficient to establish his guilt. He argues that the evidence failed to establish that the stocks and bonds listed in the balance sheet of December 31, 1957, which was mailed to the Maryland addressees, were the same stocks and bonds listed by name in the balance sheets of September 30, 1957. He contends that only by inference could this fact be established. He urges that his conviction rests upon the further inference that the stocks and bonds were valueless because the companies were chartered after the balance sheet of September 30, 1957 was prepared, and upon the inference that no other corporations with the same names existed prior to the formation of the companies chartered in Panama in December 1957.

■ In support of this position Hopps relies upon United States v. Ross, 92 U.S. 281, 23 L.Ed. 707 (1875) and Wesson v. United States, 172 F.2d 931 (8th Cir. 1949) which express the principle that a verdict cannot be predicated upon inferences drawn from other inferences or upon presumptions resting on the basis of other presumptions. Hopps' reliance upon the doctrine of these cases is misplaced. His conviction does not rest upon a progression of presumptions. From the testimony of an accountant concerning the bonds, and a bookkeeper concerning the stocks and bonds, the jury could find that the stocks and bonds listed in the two balance sheets were the same. The jury could find the securities were worthless from the manner in which the balance sheets were prepared, the facts relating to the Panamanian companies, and the investigation of the affairs of International in Tangier.

Hopps testified the stocks and bonds were issued by corporations bearing similar names that were in existence prior to the time the companies were chartered in Panama. He also testified that he did not know the stocks and bonds were valueless. This testimony, he argues, exonerates him on the basis of the doctrine that "once the predicate for the ultimate inference has been contravened by substantial evidence it ceases to have validity." He relies upon Ribaste v. United States, 44 F.2d 21 (8th Cir. 1930); Ezzard v. United States, 7 F.2d 808 (8th Cir. 1925). These cases do not require that his conviction be reversed. The facts in this case make them inapplicable. Hopps' conviction does not rest upon inferences supported only by inferences. Substantial evidence supports the verdict of the jury. Under well settled principles the verdict must be sustained. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

II.

■ Hopps urges that the District Judge erred in instructing the jury that

it could consider the evidence with respect to reinsurance facilities in determining whether Hopps willfully caused the brochures to be mailed as a part of the alleged scheme to defraud.

The testimony about reinsurance was contradictory. Hopps testified that International had reinsurance facilities commensurate with the description in the brochure. From the testimony of other witnesses the jury could find that the company lacked these facilities and that Hopps knew of this deficiency.

Paragraph 5 of the indictment charged:

"Beginning on or about August 1, 1957, and continuing until on or about April 3, 1958, the defendants, Stewart B. Hopps and Robert Hopps devised and intended to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations from those persons in the United States of America who, relying upon the claimed assets of the corporation of Tangier, Morocco, could be induced to purchase insurance coverage from it."

The brochure did not describe the reinsurance facilities as "assets" and for that reason the District Judge declined to charge the jury that conviction could be based upon the representation concerning the company's reinsurance facilities. The District Judge very carefully explained to the jury all of the elements of the crime charged in the indictment. His reference to the reinsurance facilities is found in the following excerpt from the charge:

"The brochure is also alleged by the indictment to have been false in one additional particular; that is 12(a), where the indictment alleges that 'the brochure falsely and fraudulently represented that International Guaranty and Insurance Company had extensive reinsurance facilities with companies of age, standing, and stability, and with millions in assets; and that International Guar-

anty and Insurance Company reinsures anything above a small net retention on general business. As the Defendant, Hopps, well knew, International Guaranty and Insurance Company did not have extensive reinsurance facilities; it had not reinsured any of the insurance coverage which had previously been written on risks in the United States of America; it had no reasonable prospect of being able to reinsure any of the insurance coverage then being written on risks in the United States.'

"Now, I instruct you that you may consider the evidence offered on that point, on the question of wilfullness on the part of Stewart B. Hopps; that is, whether Stewart B. Hopps wilfully caused the letters and brochures to be mailed as part of the alleged scheme to defraud and to obtain money by means of false and fraudulent pretenses and misrepresentation; and that he knew, at the time the brochures were mailed, that the brochure was false and fraudulent in the two particulars I have referred to (namely, the bonds of Republic Finance or Finance Republique; and the stocks of the other three Panamanian corporations).

"As I have said, if you find that the statements in the brochure with respect to reinsurance were false, that would not prove the Defendant guilty of the offenses charged, which are being submitted to you for your consideration. He can only be found guilty of the offenses charged if you find him guilty, beyond a reasonable doubt, of the essential elements of those charges as they are stated to you in these instructions."

The District Judge did not err. In Aiken v. United States, 108 F.2d 182, 183 (4th Cir. 1939), Judge Dobie wrote:

"Fraudulent intent, as a mental element of crime, (it has been observed) is too often difficult to prove by direct and convincing evidence. In many cases it must be inferred from

a series of seemingly isolated acts and instances which have been rather aptly designated as badges of fraud. When these are sufficiently numerous they may in their totality properly justify an inference of a fraudulent intent; and this is true even though each act or instance, standing by itself, may seem rather unimportant. * * * "

### III.

The defendant has assigned error to the Court's refusal to suppress papers that were obtained in California, New York and Maryland.

The District Judge held extensive hearings on the motions to suppress.[2] The papers fall into three general classifications—International's records, records of other corporations in which Hopps was interested, and Hopps' personal records. The District Judge suppressed Hopps' personal records; he denied the motions to suppress the corporations' records.[3]

Hopps asserts that the District Judge's findings of fact with respect to the motions to suppress are not supported by the record and are contrary to the facts. An examination of the record fails to sustain this assignment of error. The findings are supported by the evidence— much of which was in conflict—and by reasonable inferences drawn from the evidence.

In early 1958 the California Insurance Department began to investigate International to determine whether it was operating in violation of the California Insurance Code. In March the Insurance Commissioner had gathered sufficient information to indicate that International was unlawfully conducting an insurance business in San Francisco, California in an office at 417 Montgomery Street, which was also used by Hopps and other corporations in which he was interested.

Before taking any action the California officials conferred with the general counsel of International, and at his request, deferred instituting proceedings. However, the Insurance Commissioner, having learned a few days later that assurances given to defer action were not being observed, promptly petitioned the Superior Court of San Francisco County for the appointment of a conservator.[4] This Court vested all International's assets in the Insurance Commissioner, appointed the Commissioner conservator of International, directing him to take possession of all the company's books, records and property, and enjoining Hopps, his associates and employees from transacting International's business and disposing of its assets.

The day the order appointing a conservator was entered, a representative of the Insurance Commissioner called at 417 Montgomery Street and was told by Hopps' employees that no records of International were there. That evening and the next day Hopps and some of his staff removed certain records of International from the San Francisco office to Phoenix, Arizona. Hopps and International's general counsel engaged Lloyd Dinkelspiel and Eugene S. Clifford, members of a law firm which had represented Hopps in other matters, to represent International in the conservatorship proceedings. The District Judge found that these lawyers were supposed to look out for Hopps' personal interests as well.

A few days later a press release was issued by California officials, with the approval of Dinkelspiel, stating that International's management had agreed to give the Commissioner full access to the records of the company and had announced their intention to permit full dis-

---

2. United States v. Hopps, 215 F.Supp. 734 (D.Md.1962)

3. Hopps' contention that all the papers which were seized are his personal property is not supported by the record. Also an examination of the exhibits introduced into evidence discloses that the District Judge properly determined the exhibits were corporate records.

4. These proceedings were filed in accordance with Cal.Ins.Code Ann. § 1011.

closure of the affairs of the company. Pursuant to this arrangement, two investigators from the office of the Insurance Commissioner met Clifford at 417 Montgomery Street. The investigators examined file cabinets in the outer office and the vault. They did not go into Hopps' small private office. It was Clifford's responsibility to see that they did not rummage through Hopps' personal files. Clifford inspected everything that the investigators wished to remove. He declined to permit them to remove certain files and they acquiesced in his judgment. The investigators removed a number of papers after review by Clifford and without his objection.

International challenged the jurisdiction of the California court and the facts upon which the order appointing the conservator had been obtained. Its motion to vacate the order appointing the conservator was denied. The California court terminated the business of International in California and appointed the Insurance Commissioner its liquidator. While the papers were in custody of the state officials, postal inspectors were permitted to examine them.

In March 1960, when the proceedings were almost concluded, the California court ordered the Insurance Commissioner to return the papers to International. However, while the papers were still in the hands of the Commissioner, subpoenas were issued out of the United States District Court for the District of Maryland directed to the Insurance Commissioner and to Clifford as attorney for International, calling on them to produce the records in the District Court for a criminal trial that preceded the trial of this case. Clifford filed a petition in the United States District Court for the Northern District of California, where the Judge modified the subpoenas. The California court also modified its previous order that the papers be returned to International. There was no objection to the transmission of the papers pursuant to the subpoenas after they had been made more definite on application of the United States District Court for the Northern District of California. The papers were sent to the District of Maryland and placed in the custody of the United States Attorney for that District.

In 1959 the Attorney General of New York initiated an inquiry into the practice of certain savings and loan associations within New York. In connection with this inquiry Loretta C. Lindhauer was served with a subpoena duces tecum, requiring her to appear before the Attorney General of New York to produce files pertaining to International.[5] Miss Lindhauer had been Hopps' personal secretary for many years. At this time she was on the payroll of Anglocan, a corporation in which Hopps was interested. She had custody of the records in an office used by Hopps and various corporations in which he was interested. Miss Lindhauer was advised by Hopps to consult his New York attorneys. They suggested that she consult her own attorney. Miss Lindhauer, acting upon her counsel's advice and through arrangements made by him, delivered the records to a Special Assistant Attorney General and identified them.

The records were sent to the District of Maryland by the New York Attorney General's office pursuant to a subpoena duces tecum issued in this case at the request of the United States Attorney.

The Maryland papers were obtained by subpoena duces tecum directed against the International Guaranty and Insurance Underwriters, which had an office in Silver Spring, Maryland. In early 1958 Hopps had an interest in this corporation. The District Judge found that prior to the time the subpoena was served other persons had assumed control from Hopps. The attorney for the corporation on April 22, 1958 delivered to the Government the records of the corporation called for in the subpoena. The corporation did not contest the subpoena.

---

5. This action was taken under N.Y. General Business Law, Art. 23–A, § 352.

340

■ We find no error in the District Judge's denial of the motions to suppress the corporate records. Although some of the papers originally were obtained by officials of the states of California and New York, the District Judge correctly held that in determining whether they should be suppressed, Federal standards must be applied. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

■ The rights secured to Hopps by the Fourth Amendment were not violated by refusal to suppress the corporations' papers. Peel v. United States, 316 F.2d 907 (5th Cir. 1963). Since Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) it has been recognized that an officer of the corporation can not assert his rights under the Fifth Amendment to prevent the use of corporate records which have been produced by lawful means.[6]

■ The mandate of the Fourth Amendment can not be stated in absolute terms. Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Rigid adherence to the concept that a corporation is an entity distinct from its officers and stockholders may not always be an appropriate basis for determination of constitutional rights. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L. Ed. 319 (1920) suggests that under facts and circumstances—not present in this case—an individual may be aggrieved by the illegal search and seizure of corporate records.[7] The clarification of status to envoke the Fourth Amendment found in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) is consistent with this principle. Indeed, such a conclusion was reached in Henzel v. United States, 296 F.2d 650 (5th Cir. 1961).[8] There the president and sole stockholder of a corporation was accorded standing to challenge the search and seizure of corporate papers. The circumstances of that case are quite different from the case at bar. There a judgment creditor obtained a general levy on the corporation's assets. A deputy sheriff permitted a postal inspection to accompany him to the corporation's plant, to search the premises and to seize corporate books and records which were in the president's office.

The pertinency of the caveat expressed in Henzel[9] is demonstrated by another case decided by the Fifth Circuit eighteen months later. In Peel v. United States, 316 F.2d 907 (5th Cir. 1963) corporate records were obtained by a county official by subpoena duces tecum. He permitted federal officials to inspect them. The records were subpoenaed by

6. This principle is reviewed in United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

7. Suppression of corporate records upon the motion of its sole shareholder who asserted violation of rights secured to him by the Fourth Amendment has been denied although the records were concededly illegally seized. Lagow v. United States, 159 F.2d 245 (2nd Cir. 1946); cert. denied 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865 (1947). In the present case, however, the seizure was not unlawful.

8. See also United States v. Kanan, 225 F. Supp. 711 (D.Ariz.1963). There the Court, after concluding that corporate officers had standing to suppress corporate documents, applied state law to determine the legality of the seizure. We are of the opinion that the Rules of Decision Act, 28 U.S.C. § 1652, upon which reliance was placed for the application of state law, provides no basis for determining the admissibility of evidence in a federal criminal prosecution. The requirements of the Fourth Amendment must be tested by federal law. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

9. The Court stated at 296 F.2d 653:
"This is not to say that every employee of a corporation can attack the illegal seizure of corporate property if the fruits of the search are proposed to be used against him. Each case must be decided on its own facts. We only hold that, under the facts presented here, the appellant had a sufficient interest in the property seized and premises searched to enable him to challenge the propriety of the Government's conduct under Rule 41(e)."

the United States Attorney after they had been surrendered by the county official to the United States Attorney's office for use at the trial. Upon these facts, which are quite similar in their material aspects to the case at bar, the Court denied suppression of the corporate records on the ground that a subpoena duces tecum was the lawful way to require production of the records.

We find nothing in the facts and circumstances of this case that requires the suppression of the corporate records. None of these records was unlawfully seized. The California proceedings were valid. Their constitutionality has been sustained. Neblett v. Carpenter, 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938). The order of the California Court did not mention the location of the papers, but this omission is not fatal. The California officials obtained the papers from the San Francisco office by agreement with International's counsel.

The examination of the papers by New York and Federal officers while they were in the custody of the California officials and their transmittal to Maryland pursuant to a subpoena duces tecum does not require their suppression. Dier v. Banton, 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915 (1923); Ex parte Fuller, 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881 (1923); Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913).

The acquisition of the New York papers by the Attorney General was lawful. The sections of the General Business Law of New York, under which the subpoena was issued, have been held constitutional. Dunham v. Ottinger, 243 N.Y. 423, 154 N.E. 298 (1926).[10]

Hopps challenges the validity of the New York subpoena because it was directed to Miss Lindhauer, who, he con-tends, was not authorized by him to comply with it. This contention is without merit. The District Judge was correct in determining from the evidence that she was the custodian of the corporate records.

Hopps claims immunity provided by Article 23-A, § 359 of the New York General Business Law. See People ex rel. Kenny v. Adams, 292 N.Y. 65, 54 N.E.2d 10 (1944), and Dunham v. Ottinger, 243 N.Y. 423, 154 N.E. 298 (1926). Hopps, however, did not testify in the New York proceedings nor produce any documents pursuant to subpoena. His claim that the New York proceedings were directed against him personally and that the manner in which the papers were acquired was a subterfuge to defeat his immunity is not supported by the weight of the evidence. Hopps, therefore, does not come directly or indirectly within the provisions of § 359.

A subpoena duces tecum may be so broad and so indefinite that it violates the Fourth Amendment's prohibition of unreasonable searches. Federal Trade Commission v. American Tobacco Company, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). Hopps' reliance upon this doctrine with respect to the New York papers and the Maryland papers is not supported by the evidence. With respect to both subpoenas duces tecum the District Judge was justified in finding that they commanded only the production of records relevant to the investigation being pursued, and that they were not unreasonably broad.

The New York subpoena did not require the production of all corporate records in the custody of Miss Lindhauer. On the contrary it specified with reasonable particularity the subjects to which the papers related and was limited to a

---

10. In this case at 154 N.E. 301 the Court of Appeals of New York considered the New York statute to be similar to laws of other states whose constitutionality has been sustained by the United States Supreme Court. Among the cases cited in illustration are Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493 (1917).

reasonable period of time. Miss Lind-hauer readily identified the files which were sought. The Maryland papers were comparatively few in number and were delivered by the attorney for the corporation for which the subpoena had been served without difficulty or protest. The disclosure sought was not unreasonable. The production of the records pursuant to the subpoena did not violate Hopps' rights under the Fourth Amendment. McPhaul v. United States, 364 U.S. 372, 382, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960); Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946); Brown v. United States, 276 U. S. 134, 143, 48 S.Ct. 288, 72 L.Ed. 500 (1928).

Hopps argues that the Trial Court erred in utilizing the information obtained through the search and seizure of the California papers as justification for the search and seizure. The record refutes this contention. The District Judge carefully pointed out that he did not use the documents to determine whether they should be suppressed.[11]

Hopps' assertion that the District Judge failed to grant him a hearing to determine whether the suppressed documents provided leads for the prosecution and thus tainted the investigation is also without merit. The District Judge specifically stated that he would afford Hopps a hearing on this issue. The hearing was held and although Hopps introduced no testimony on this issue, he was afforded an opportunity to do so. Moreover, the record shows that the District Judge at this hearing considered whether Hopps' individual papers tainted the investigative leads. His rulings in this respect are nowhere shown to be erroneous.

We find no merit in the contentions of the appellant. The judgment of the District Court is, therefore,

Affirmed.

11. In the transcript of proceedings of January 9, 1963 at page 8, the Court said:
"Defendants argue as though statements of fact in the documents had been used to support or justify the search. Not so. The search was justified by the order of the California Court, the agreement of Dinkelspiel, and the acquiescence of Clifford."
This comment is fully substantiated by the record on the motions to suppress.