[No. 35647.    *En Banc.*    November 9, 1961.]

THE STATE OF WASHINGTON, *Respondent,* v. JOSEPH CHESTER SELF, *Appellant.*\*

\*Reported in 366 P. (2d) 193.

*Alan F. Austin* and *Daniel J. Riviera,* for appellant.

*Charles O. Carroll* and *James D. Burns,* for respondent.

DONWORTH, J.—This is an appeal from a judgment and sentence based upon a jury verdict in which appellant was found guilty of murder in the first degree and the death penalty was imposed by the jury.

Appellant was charged in the information with the premeditated murder of Ralph Gemmill, a taxicab driver, committed during or in connection with the robbery of the victim by appellant. Thus he was charged with first-degree murder, committed either with premeditation or while engaged in the commission of a robbery.

He was represented in the trial court and in this court by two court-appointed attorneys. On his arraignment appellant stood mute, and a plea of not guilty was entered by the court.

At his trial appellant took the stand in his own defense, and admitted robbing Gemmill at gun point and firing two shots into the victim's body, but testified that the victim lunged at him and grabbed for the gun, precipitating a struggle, during which the two fatal shots were accidentally fired.

It is not contended on this appeal that the state failed to produce substantial evidence which, if believed by the jury, fully justified the verdict. Indeed, appellant's own testimony on the witness stand is sufficient to sustain the verdict of first-degree murder committed during the robbery of the victim of the homicide. In their arguments to the jury, the principal issue discussed by all counsel was whether the death penalty should be imposed. Therefore, it is not necessary to discuss the evidence except as it bears upon appellant's assignment of error, which is stated in his brief as follows:

"The appellant asserts:
  "a. Where a defendant has been charged in a capital case; and
  "b. A warrant of arrest has been issued by a court ordering the sheriff to apprehend the defendant and bring him before the court to be dealt with according to law; and

"c. Where the defendant is taken into custody of the sheriff under authority of the warrant; and

"d. Where the defendant, being without funds, requests the assistance of counsel;

then due process of law requires the sheriff to bring the defendant before the judicial authorities, without questioning him, to be advised of his constitutional rights and to have counsel appointed to assist him and to be dealt with according to law. Failing so to do, evidence secured by the State, after such apprehension and request, should be suppressed by the court at the request of the defendant. The court's failure to grant the appellant's objections to the introduction of such evidence (including the gun, Ex. 44, the shells, Ex. 47, the testimony of witnesses McCullough, Zimmers and Kelman) constitutes a failure to accord appellant due process of law guaranteed him under the 14th Amendment to the United States Constitution."[1]

The state and appellant stipulated as follows regarding the filing in the justice court of a criminal complaint on March 18, 1960, charging appellant with murder in the first degree:

"One, on March 18, 1960 a criminal proceeding was filed in Justice of the Peace Evangeline Starr's court here in King County, Cause No. 11085, charging Joseph Chester Self with murder in the first degree. And the Complaint was filed in 11085 and was in language substantially similar to that contained in the Information for this proceeding. The Complaint was signed by Joel A. C. Rindal, Chief Deputy Prosecuting Attorney. On the same day, March 18, 1960, a warrant of arrest was issued against Joseph Chester Self charging the Sheriff of King County, in the name of the State of Washington, to apprehend the said Joseph Chester Self and bring him before the Justice of the Peace to be dealt with according to law. And I think the language of the warrant is important. March 18, 1960 was a Friday. On March 20,

---

[1]Two months subsequent to the argument of this case in this court, appellant, *pro se,* served on the prosecuting attorney and filed herein "Appellant's Supplemental Brief" (consisting of twelve typewritten pages) in which additional points are raised and argued. Appellant states therein that he has full faith in his counsel but desires to supplement their arguments in his behalf. This supplemental brief has been considered in the preparation of this opinion.

1960 the defendant surrendered himself and was taken into custody under authority of the warrant which I have just described. March 20 was a Sunday.

"On that evening, that is the evening of March 20 the defendant signed a statement which has been referred to as a confession. And subsequent to March 20 further investigation was made on the basis of the information contained in the confession.

"The Information in the Superior Court proceeding was not filed until March 28, 1960. Subsequent to its filing the defendant was arraigned and counsel was appointed for the defendant on March 29, 1960. And up to March 29, 1960, the defendant Joseph Chester Self had no counsel of any kind to represent, consult with, or advise him in any particular regarding his rights under the United States Constitution or the laws of the State of Washington.

"We further state that after being apprehended by the Sheriff on Sunday, March 20, the defendant Joseph Chester Self requested counsel but no response was made to his request. He was apprehended at about 4:30 and was questioned after 4:30 and at about 9:10 of the same evening signed a statement which has been referred to as a confession. Those are the facts.

"THE COURT: In what respects does the State controvert or would controvert these facts?

"MR. McGOUGH: The only possibility of controversion in Mr. Riviera's statement is the use of the term 'request for counsel'.

"We will agree that Mr. Self mentioned a general desire to consult with some unknown attorney one or two times during the interrogation, but I think that is about all the further it went. That is just a question of phraseology, I think. Aside from that, we are willing to agree to all the facts that Mr. Riviera stated."

At the time that the warrant for his arrest was issued on March 18, 1960, appellant was at large in the Eatonville and Elbe area in Pierce County. On Sunday, March 20, 1960, appellant telephoned the sheriff's office at Tacoma that he desired to surrender himself to the sheriff of Pierce County at a certain ranch. This was accomplished about 4 p.m., whereupon the sheriff of Pierce County then and there delivered him to the custody of the sheriff of King County.

The latter and one of his deputies then drove appellant in their car to the King County jail, arriving there about 6:30 or 7 p.m.

During the ride, appellant inquired of the officers as to the death penalty in this state and was told that it was hanging. He testified that he expressed a desire to see a reporter and then a lawyer at that time. The sheriff in his testimony had no recollection of this request.

After their arrival at the jail in Seattle, appellant had supper (according to him it consisted of two hard rolls and coffee). About 8 p.m., appellant was taken to the sheriff's office where the sheriff and the captain of detectives questioned him in the interrogation room. Appellant said that he wanted to see a lawyer. He made this request before he made an oral confession (which was about 8:45 p.m.).

On the witness stand, at the pretrial hearing on his motion to suppress the confession and all evidence which the state had secured by means of it, appellant was asked by his counsel what answer was received to this request. He testified (in the absence of the jury):

"At any time after your first contact with the sheriffs, which you have just referred to, did you make any request for counsel? A. I did. Q. Can you place the time when this request was made? A. After he took me to meet the Sheriff of King County. Q. And in whose presence was this request made? A. I believe it was made in the presence of the King County Sheriff, the Sheriff that took me up to Pierce County and one other officer. Q. Now, can you state as closely as you can recall the language you used in making this request? A. I told them that I wanted, I first wanted to see a reporter, then I wanted to see a lawyer. Q. Did you make this request regarding counsel on more than one occasion? A. I made it up here also one time. Q. When you say 'up here', you mean— A. Interrogating room. Q. Right here in the King County Building? A. That's right. Q. And that request which you have just referred to was made on the same day? A. Yes. Q. And was it made prior to your signing the statement? A. Yes. Q. Do you recall when you signed the statement? A. Not exactly, late at night, and I hadn't slept in about forty hours, so I can't say. It was 9:00, 9:30, 10:00

o'clock, something like that. Q. What response was made by the officer to this request? A. Well, they didn't get me no lawyer. They didn't. They stood mute on it, they just didn't say anything about it."

The trial court's ruling on appellant's motion to suppress was:

"My opinion at this juncture is that the motion to suppress the confession document taken March 20, 1960 is granted. The motion to suppress as stated 'All evidence secured through' the said document is denied."

Later in the trial, when the state offered the murder weapon in evidence, the appellant renewed his motion to suppress it and all other evidence obtained as a result of the confession. In the absence of the jury, the question was again considered.

The sheriff's version (as stated in his testimony in the absence of the jury) was as follows:

"Q. Now, Mr. McCullough, were you present when the defendant was questioned about this particular alleged murder that he perpetrated? A. Yes, sir. Q. And where was this questioning taking place, sir? A. Not questioning or in an attempt to obtain a confession—at the time the confession was made, Chief of Detective Tommy Nault and myself; it was not in the spirit of trying to obtain a confession, but to clear up some points in regard to the evidence that we had run across thus far in this particular case.

"However, during our discussion with Mr. Self, Tommy Nault and myself, Mr. Self was given the opportunity by us and at my direct saying 'You do not have to say a word if you wish to be represented by an attorney or by a lawyer.'

"However, while we were discussing some of the aspects of the particular findings of the case to determine if we had the man that we were looking for or not, he did make the voluntary statement, and I believe it is in his confession that he said, 'I know that I have the right to a lawyer but I will waive that. I want to talk, I want to explain to the people that I am not a murderer, and for that reason I wish to talk and make this statement of my own free will without consulting an attorney.' At no point was Mr. Self denied an attorney by anyone in the Sheriff's office, by myself or anyone connected with my staff. . . . Q. Now, he did ask, did he not, that he wanted an attorney? A. On the ride in from the point of contact near the Alder cutoff, Eaton-

ville and Elb area, no request was made for an attorney. Q. I see. Did he make a request for an attorney? A. While he was here in the county jail Mr. Self said that he was desirous of obtaining the services of an attorney. Yes, that statement was made by Mr. Self. Q. What did you say in reply to that statement? A. That it was certainly his legal right and there was no objections. In fact, he was encouraged to obtain the services of an attorney. Q. There was no denial of the right to attorney? A. At no point. Q. Although he did request an attorney, was that before he gave you the statements orally or after? A. That request, and it was in the presence of Captain of Detectives Nault, was prior to the time that he said he wished to talk, yes. Q. But in any event you did not deny and he did ask for it and you said, 'Yes, you could have one'? A. We have never denied the request. Q. What time did he give his oral statement? A. On arriving at the County jail with Mr. Self, I asked if they would not take Mr. Self to the county jail and feed him because at this point he was not talkative, to say the least; and he must have been under a great strain in this period,— to take him to the county jail and feed him. And the photographers and reporters were in a great—no, in the corridors. We told them there would be no access or no one could contact him for at least an hour after he had eaten, to give him a chance to collect his thoughts and rest and so it was after 8:00 o'clock when we next talked with Mr. Self. Q. You talked with him in the car, but he didn't say much? A. Just at three different points was there any statement made. Q. So then it was about 8:00 o'clock when you started questioning him? A. When we talked to him. Q. And it was what time, if you can recall, after that time that he asked for an attorney? A. It was after the 8:00 o'clock time; the period between roughly 8:00 o'clock and before he did state that he wished to make the statement without consulting an attorney. It was prior to that time that he did ask, state that he would like to have an attorney. Q. It was prior to 8:00 o'clock or after 8:00 o'clock? A. It was after 8:00 o'clock. Q. What time did he give you the oral statement, if you recall? A. That would have been—and I am not too sure on the particular time, but it would have been roughly in the neighborhood of probably a quarter to 9:00. Q. Quarter of 9:00 he gave you the oral statement. Then when was the written statement taken, if you recall? A. That would have been probably at roughly 10:30. I am guessing again on the time. I could be wrong. Q. After that time he made the statement to the TV and press? A. It was after the quarter

to 9:00 time when he expressed his desire to change his attitude on that, yes, it was after that that I was given a written statement. Q. You and Chief of Detectives Mr. Nault questioned him? A. We talked to him. Q. Now, were there any members of the prosecuting attorney's office there? A. There was no one. This is a Sunday evening in the County-City Building. It was something that we did not know of the exact time of bringing a man to the county jail. It was a time we do not know; did we or did we not have the right man. No, it was a discussion there to try and sum up what we had gone through the past few days from the day of the finding of the body in the south end. Q. Was this statement to you free and voluntary? A. Yes. Q. Was there any duress, force or coercion, any time, either physical or verbal? A. Never. Q. What did he finally say after he gave the statement? Did he say any more about wanting an attorney? A. He had made the request stating that he would like to have an attorney. At that time, after he decided he would like to get this off his chest, was I think probably close to his own words, then expressing his own desire to meet with the press, and even TV. The request for an attorney was made after that particular time, but when I would not say. Q. Now, as to the particular gun, when was that retrieved? A. The gun was retrieved the next afternoon at approximately 5:00 o'clock in the locality as shown on the picture here in the morning, in a bank at the side, at the Battle residence. Q. Had he stated in his statement the location of the gun? A. Orally he stated that he had not been accurate in saying he had thrown the gun away at the scene of the crime. Q. So it was not true what he said at the time you took the statement? I mean what he said what he had done with the gun was not correct, is that correct? A. He himself said that he was wrong in stating the first time he had told us the location of the gun, yes. Q. So the next day did you ask him where the location of the gun was? A. He had told us where the location, the approximate location of the gun was in the Battle residence, yes. MR. BURNS: Was there anything your Honor wanted to question the witness on? One more question. Q. (By Mr. Burns) He said he wanted an attorney before he gave you the oral statement? A. That statement was made prior. Q. And you said 'Yes, you have a perfect right' or something like that, 'to have an attorney'? Did he say anything then before he gave the statement? Did he say anything about not wanting an attorney or going ahead without an attorney? A. During our discussion he said, and I am quite sure, as I stated before, this isn't a

confession, 'I realize that I should have an attorney.' I had cautioned him that he need say nothing until consulting an attorney. And both at that time and in his written confession he stated, 'I realize that I am entitled'—or words to that effect—'to an attorney, but I want to get this off my chest and prove that I am not a murderer.' Q. Cold-blooded murderer? A. Cold-blooded murderer, I think was the word."

Shortly after making his oral confession, sometime between 8:30 and 10 p.m., appellant signed a written statement (referred to in the testimony as a confession) consisting of nine and one half pages written in longhand (witnessed by a detective and an employee of a television station) in which he admitted the robbery, but stated that the gun was accidentally discharged twice during a scuffle over the gun. Attached thereto was an additional sheet of paper, dated the next day, bearing the following statement:

"The gun I used in the shooting is at the house where I surrendered myself to Sheriff Stojac."

On appellant's motion, this statement and the additional page were suppressed and were never admitted in evidence except for the court's use only. Consequently, there was no written confession submitted to the jury in this case and we are concerned here only with appellant's oral admissions.

Nevertheless, appellant contends that the oral and written confessions were illegally obtained, and that all evidence and leads to evidence obtained through that source are inadmissible under the due-process clause of the fourteenth amendment to the United States Constitution, as well as under Washington law.

The only Washington statute regarding exclusion of confessions is RCW 10.58.030, which provides:

"The confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, except when made under the influence of fear produced by threats; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony."

Since it is not contended that the evidence in issue on this appeal was the result of fear produced by threats, the Washington statute does not apply.

There is also a court-developed rule of exclusion which holds inadmissible a particular type of evidence which was illegally obtained by the officers and was involuntarily given up by the possessor: evidence obtained by unlawful search and seizure. See *State v. Knudsen*, 154 Wash. 87, 280 Pac. 922 (1929); and *State v. Young*, 39 Wn. (2d) 910, 239 P. (2d) 858 (1952).

Stricter than the Washington statute and more in point than the search and seizure cases, although not incompatible with them, is the federal constitutional test based on the due-process clause of the fourteenth amendment. That test was recently set forth in *Culombe v. Connecticut*, 367 U. S. 568, 6 L. Ed. (2d) 1037, 81 S. Ct. 1860:

" . . . No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning — deprecated by the E n g l i s h judges; nor undue delay in arraignment—proscribed by *McNabb*; nor failure to caution a prisoner—enjoined by the Judges' Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. See *Lisenba v. California*, 314 U. S. 219; *Crooker v. California*, 357 U. S. 433; *Ashdown v. Utah*, 357 U. S. 426.

"Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond*, 365 U. S. 534. The line of distinction is that at which governing self-

direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

The constitutional test, then, is whether under all the circumstances the information given to the sheriff was given voluntarily.

Appellant strenuously urges adoption of the reasoning of the two concurring opinions in *Spano v. New York*, 360 U. S. 315, 3 L. Ed. (2d) 1265, 79 S. Ct. 1202 (1959). There the accused, an emotionally unstable man with no past history of law violations, was under indictment for first-degree murder. His original offer to surrender had been made over the telephone to an old childhood friend who was then a rookie policeman. His lawyer, who had accompanied him to the police station where he formally surrendered, had instructed him to say nothing to the police. After an all-night inquisition, during which the police had denied the accused's repeated requests for permission to talk to his lawyer, a confession was finally obtained, but not before effective fraudulent use of the "childhood friend" had been made by the police. Acting on instructions, the "friend" had lied to the accused, telling him that he (the rookie policeman) was in serious trouble, and that his career as a policeman would be in jeopardy if the accused did not confess. The "friend" attempted to gain the sympathy of the accused for the "friend's" pregnant wife and three children by describing what would happen to them if he lost his job. It was only after the fourth appeal to friendship and sympathy (the final act lasting over an hour) that Spano had confessed.

The concurring justices thought that *under these circumstances* the mere absence of counsel when the confession was elicited was alone sufficient to render the confession inadmissible under the fourteenth amendment. This reasoning seems to be just another way of saying that a confession given in the absence of counsel under such circumstances, is involuntary *per se*. Therefore, even were we to adopt the above reasoning, the test would remain: Considering all of the circumstances, was the confession voluntary or not? The concurring opinions in *Spano v. New York, supra,* did not

adopt·such an automatic and mechanical exclusionary rule as is advocated by appellant's assignment of error. We refuse to adopt the rule advocated by appellant.

How do the legal requirements for admissibility of evidence affect the instant case? First, it must be ascertained which evidence is sought to be excluded. The case went to the jury under alternative theories, felony-murder and premeditation, under either of which the jury could have found appellant guilty of first-degree murder.

Appellant's own version of the killing, to which he has consistently adhered throughout this case, constitutes first-degree murder under the felony-murder rule (see RCW 9.48.030(3), and *State v. Wilson*, 26 Wn. (2d) 468, 174 P. (2d) 553 (1946)). Therefore, the only evidence which could have prejudiced appellant's position at the trial, and of which he now can complain, is that evidence which tended to (1) contradict appellant's own story, and (2) support a version of the killing which the jury could have regarded as more reprehensible than appellant's own version. In other words, we need only to consider evidence which could have led the jury to inflict the death penalty, assuming they might not have recommended it if they had believed appellant's description of the killing. Such evidence would necessarily have to be evidence which furnished support for the only part of the state's case which appellant denied at the trial, namely that the killing was intentional and premeditated.

The murder weapon itself led to the only such evidence in this case. That exhibit, and the testimony of the Federal Bureau of Investigation agent to the effect that the gun invariably jammed and had to be cleared manually, constituted the only evidence, now claimed inadmissible, which conflicted with appellant's own testimony on the witness stand or with his oral confession. That evidence, along with the autopsy surgeon's testimony that there was at least a five-minute interval between the two shots, plus certain other evidence in the case, is all that tends to negate appellant's version of the killing—that it was caused by the victim's grabbing the gun—and therefore could have been prejudicial to the extent that it could have been the basis

for the jury's decision to impose the death penalty in its special verdict. Therefore, the only arguments which need to be considered are those arguments which are concerned with the admissibility of the murder weapon and the evidence to which it led, all of which shall be referred to by such generic terms as "the gun," and "the murder weapon."

It is contended that the admission of the gun into evidence was error for three reasons. First, it is argued that it was the product of an inadmissible confession on Sunday night—the "fruit of the poisonous tree." Second, it is said that the finding of the gun was a result of denying counsel to the appellant. Third, it is claimed that the gun is inadmissible because it is the product of illegal detention—an unlawful delay in bringing appellant before a magistrate.

■ In support of appellant's claim that the confession given on Sunday (the day appellant voluntarily surrendered to the officers) was inadmissible, and that the gun is, therefore, inadmissible as "the fruit of the poisonous tree," it is contended that the confession is inadmissible as a matter of law because it was given in absence of counsel and prior to arraignment. No such automatic test applies. The test is whether or not the confession was voluntary. *Culombe v. Connecticut, supra.* Appellant asked for a newspaper reporter before he asked for counsel. He was not prohibited from obtaining counsel. At the time of his arrest he was twenty-nine years of age. He had had an eighth grade education. He had considerable past experience with the law: four prior convictions, three of them felonies. He knew he could refuse to talk to the officers until he had counsel, but there is evidence that he expressly waived the right. After only forty-five minutes of questioning, he decided to get the matter "off my chest," in order to show that he was not a "cold-blooded murderer." At his own request, he went on television to tell his story to the public. Later, in court, with his attorney present, he repeated the same story from the witness stand.

Nothing in the above facts even tends to indicate that the oral confession was involuntary. On the contrary,

the evidence is overwhelming that the confession was voluntary. Thus, there is no "poisonous tree" of which the discovery of the murder weapon is the fruit. Furthermore, the gun is not entirely the "fruit" of the confession, since appellant voluntarily went out and helped the sheriff find it the next day after his arrest and oral confession.

■ The second argument for appellant is that the discovery of the gun was a product of denial of counsel. To exclude a confession[2] for this reason, two elements must be shown: (1) the right to counsel must have been denied, and (2) the confession must have been so much a result of that denial that it became, in effect, an involuntary confession. In this case there was no showing that appellant was ever denied counsel. In fact, he does not assert that he was denied permission to talk to a lawyer, but merely contends that the failure of the police to obtain counsel for him was somehow a denial of counsel.

It is argued that the sheriff's failure to produce appellant in the justice court on Monday morning prevented his receiving court-appointed counsel at that time under RCW 10.01.110, and that his cooperation in pointing out to the sheriff the location of the murder weapon was involuntary *per se,* because it was a result of the sheriff's failure to comply with the mandate contained in the warrant of arrest. On the contrary, even if such failure to comply had constituted a denial of counsel, information obtained by the officers thereafter would not automatically become involuntary and inadmissible.

The problem is dealt with in *Crooker v. California,* 357 U. S. 433, 2 L. Ed. (2d) 1448, 78 S. Ct. 1287 (1958), in which the court says:

"Petitioner's claim of coercion, then, depends almost entirely on denial of his request to contact counsel. This Court has not previously had occasion to determine the character of a confession obtained after such a denial. But we have held that confessions made by indigent defendants

---

[2]The information and help given by appellant in finding the gun must be treated, and referred to, as a confession, for the purpose of this appeal.

prior to state appointment of counsel are *not* thereby rendered involuntary, even in prosecutions where *conviction* without counsel would violate due process under the Fourteenth Amendment.· . . ." (Italics ours.)

Later in its opinion, the court goes on to say:

"He [petitioner] would have every state denial of a request to contact counsel be an infringement of the constitutional right *without regard to the circumstances of the case.* In the absence of any confession, plea or waiver—or other event prejudicial to the accused—such a doctrine would create a complete anomaly, since nothing would remain that could be corrected on new trial. Refusal by state authorities of the request to contact counsel necessarily would then be an absolute bar to conviction. On the other hand, where an event has occurred while the accused was without his counsel which fairly promises to adversely affect his chances, the doctrine suggested by petitioner would have a lesser but still devastating effect on enforcement of criminal law, for it would effectively preclude police questioning—*fair as well as unfair*—until the accused was afforded opportunity to call his attorney. Due process, a concept 'less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights,' *Betts v. Brady,* 316 U. S. 455, 462 (1942), demands no such rule."

■■ The essential test remains: Was appellant's confession voluntary? There was no evidence of coercion on the part of the sheriff or his deputies. Furthermore, where the accused, the day before he went out to search for the gun, had indicated to the officers that he was aware of his right to counsel, then expressly waived the right, and where there is no evidence that he requested counsel between the time of his waiver and the time he located the murder weapon, it can be said that the waiver remained in effect. From this, two conclusions can be drawn: (1) There was no denial of counsel (since the right cannot be denied by mere failure to provide court-appointed counsel when an express waiver of the right to counsel is in effect); and (2) the assistance given the sheriff in the search for the gun was voluntary.

It is clear, then, that the right to counsel was not denied, and that even if the right had been denied, such denial in itself could not be regarded as requiring the exclusion of the gun under the circumstances of this case.

■ Appellant's final major contention regarding the gun is that the evidence resulting from finding the gun was obtained during an unlawful delay in bringing him before a magistrate, and therefore it is inadmissible under both state law and the federal constitution. It is said that there was an illegal delay because the arrest was made under the authority of a warrant which stated, *inter alia*:

". . . you are commanded forthwith to apprehend the said Joseph C. Self, and bring him before me to be dealt with according to law."

The warrant was issued pursuant to RCW 10.16.010, which provides:

"Upon complaint being made to any justice of the peace . . . that a criminal offense has been committed, he shall examine on oath the complainant, and any witness provided by him, and shall reduce the complaint to writing, and shall cause the same to be subscribed by the complainant, and if it shall appear that any offense has been committed of which the superior court has exclusive jurisdiction, the magistrate shall issue a warrant reciting the substance of the accusation, and requiring the officer to whom it shall be directed forthwith to take the person accused and bring him before the person issuing the warrant, . . ."

Appellant asserts that the mandate of the statute to apprehend him "forthwith" and bring him before the justice of the peace who issued the warrant prohibits any questioning by the police beforehand.

There is no need to consider appellant's assertion regarding the above statute, since even had the delay and request for assistance in finding the gun been illegal, the test for admissibility of evidence obtained during that period would still be: Did the accused supply the information voluntarily, considering all the circumstances? That is not only the constitutional test, but it is the test which

has been consistently applied in this state. See *State v. Haynes,* 58 Wn. (2d) 716, 364 P. (2d) 935 (1961); *State v. Johnson,* 53 Wn. (2d) 666, 335 P. (2d) 809 (1959); and *State v. Winters,* 39 Wn. (2d) 545, 236 P. (2d) 1038 (1951).

Considering the absence of coercion, the manifest attitude of appellant from the time he surrendered himself, and the fact that his express waiver of the right to counsel was still in effect, the conclusion is inescapable that it was entirely reasonable to find that appellant's assistance in finding the gun was completely voluntary. There was no error in admitting it, and the products of its discovery, into evidence.

At the close of appellant's supplemental brief, he cites *Commonwealth v. Green,* 396 Pa. 137, 151 A. (2d) 241 (1959), wherein a majority of the supreme court of Pennsylvania held that the trial court (composed of three judges) had abused its discretion in imposing the death sentence on a 15¾-year-old boy who had committed first-degree murder in an attempted robbery. The boy had an I.Q. of 80, which is a dull-normal classification. In the course of its opinion, the majority said:

" . . . The imposition of the death penalty by a judicial tribunal should be made only when it is the *sole* penalty justified both by the criminal act and the criminal himself and then only after a full and exhaustive inquiry into both the criminal act and the criminal himself. Time and again in referring to the duty of juries in fixing the penalty between death and life imprisonment we have insisted that the jury exercise its discretion only after it has considered *all* the evidence, culpatory and exculpatory, incriminating and extenuating, including what manner of man the criminal is and has been. . . . "

▮ Appellant contends that in the present case the jury was not sufficiently advised as to his general personal history and background to enable it to impose the death penalty in its special verdict. He apparently refers to reports by experts in the social, psychological, and psychiatric fields which he says have been made since his incarceration in the state penitentiary. Obviously such reports were not in existence at the time of his trial.

At his trial, appellant took the witness stand and testified at length in the presence of the jury as to his personal history and background. During this testimony (which covers more than five pages of the statement of facts), appellant voluntarily listed four periods of penal incarceration (three of them for felonies):

1. While in the army he was dishonorably discharged after serving fifteen months for black marketing in Japan.

2. Served almost three months in a county jail farm in California for petty theft.

3. Served two years in the Oregon state penitentiary for car theft.

4. Served two years in San Quentin prison (California) for burglary.

He was paroled in June, 1959, and worked in Simms, Montana, for nine months when he purchased the murder weapon and some shells at Great Falls.

On cross-examination, appellant admitted that he had purchased this gun to rob somebody.

Appellant was not hampered in any way in giving all the testimony he desired concerning his life story and general background. He did not offer to produce any experts in the fields of sociology, psychology, or psychiatry as witnesses regarding these matters. In view of the wide scope of appellant's testimony in this case both as to the circumstances under which he committed the robbery and murder, as well as to his life story and general background, we are firmly convinced that his argument, based on *Commonwealth v. Green, supra,* is without merit.

We have given serious consideration to every contention made in appellant's original brief and in his supplemental brief. We are of the opinion from our review of the record that appellant, although he refused to plead to the information upon his arraignment, voluntarily admitted to two officers on the day of his arrest, and subsequently on the witness stand during his trial, that he had robbed and murdered Ralph Gemmill. The jury, under the evidence, was entirely justified in finding him guilty of murder in the

first degree. There was also sufficient evidence upon which the jury could impose the death penalty under RCW 9.48-.030.

Since we have found no wrongful invasion of appellant's constitutional rights in this case and no reversible error committed by the trial court, the judgment and sentence appealed from is hereby affirmed.

FINLEY, C. J., MALLERY, HILL, WEAVER, ROSELLINI, OTT, and HUNTER, JJ., concur.

FOSTER, J. (concurring in the result)—I concur in the affirmance of the judgment but for entirely different reasons than given by the court.

Appellant was charged with first-degree murder by a complaint filed in the justice court on March 18, 1960, whereupon a warrant for his arrest issued. He surrendered to the sheriff on Sunday, March 20, 1960. While appellant was without funds and did not know any lawyer, nevertheless, he asked for a lawyer on the way to the jail in the sheriff's custody. Upon arrival, he again told the sheriff that he wanted to consult a lawyer before he discussed the case. Nevertheless, the sheriff continued his interrogation until the confession was obtained without honoring Self's request for counsel. This was two days after he had been charged with first-degree murder.

Upon trial, however, appellant voluntarily took the witness stand and testified to all of the material facts which he had related to the sheriff before trial. Thus the jury had from Self under oath all of the relevant facts of his prior extra-judicial confession.

There is no reason to review the evidence because no claim is made that the evidence is insufficient to justify the verdict.

Under the due process provision of the fourteenth amendment to the federal constitution,[3] the appellant claims that a defendant charged with a crime has the right to consult a lawyer prior to interrogation. Such is the question pre-

---

[3] *Cf.* Wash. Const. Art. 1, § 22 (amendment 10); RCW 10.01.110; *State v. Hartwig*, 36 Wn. (2d) 598, 219 P. (2d) 564.

sented, but all of the cases cited by the court, except *Spano v. New York,* 360 U. S. 315, 3 L. Ed. (2d) 1265, 79 S. Ct. 1202, deal exclusively with testimonial compulsion. The voluntariness of the confession or testimonial compulsion does not arise upon the present appeal.[4]

*Cicenia v. LaGay,* 357 U. S. 504, 2 L. Ed. (2d) 1523, 78 S. Ct. 1297, and *Crooker v. California,* 357 U. S. 433, 2 L. Ed. (2d) 1448, 78 S. Ct. 1287, decide that the due process clause of the Fourteenth Amendment does not guarantee *an arrested suspect* an absolute right to consult a lawyer while being questioned by the police before a charge is filed.

Judge Desmond, speaking for himself and Judges Fuld and Van Voorhis in *People v. Spano,* 4 N. Y. (2d) 256, 150 N. E. (2d) 226, 173 N. Y. S. (2d) 793, said that, because of counsel's absence, due process was denied by the admission in evidence of a confession obtained after indictment.[5]

---

[4]For a review of the cases respecting confessions obtained under testimonial compulsion, see my dissent in *State v. Haynes,* 58 Wn. (2d) 716, 727, 364 P. (2d) 935.

[5]" . . . Some violations of right are too fundamental to be excused by a jury of laymen. Directly and frankly violated here were two such rights: the right to have the advice of a lawyer at every stage of a court proceeding, and the right not to be forced to testify against oneself during such a proceeding.

"Our statutes and decisions (Code Crim. Pro., §§ 308, 699; *People v. McLaughlin,* 291 N. Y. 480; *People v. Marincic,* 2 N. Y. 2d 181) endlessly state and repeat the guarantee of every defendant's right to have the effective services of counsel at every stage of every criminal cause. But what use are these to a prisoner who, held awaiting trial, is questioned in the absence of his counsel, and contrary to counsel's express directions, until he confesses? Before a magistrate or a coroner or other judicial officer a defendant may under no circumstances be forced to make admissions of his guilt (see *People v. McMahon,* 15 N. Y. 384, *supra; People v. Mondon,* 103 N. Y. 211, *supra*). Yet the same defendant in the same criminal cause held under the process of the same court, can (it is now decided) be subjected to secret midnight questioning out of reach of any lawyer, till he confesses. Despite the *People v. Defore* rule (242 N. Y. 13) this is a violation of the right against self-incrimination since the defendant is compelled in the course of a criminal prosecution to incriminate himself by his own utterances (*People ex rel. Kenny v. Adams,* 292 N. Y. 65, 70 *et seq.*). Surely this is the use by the State of another method of obtaining evidence which 'shocks the conscience', offends accepted 'canons of decency and fairness' and so invades the due process clause of the

But the question has not been decided by the nation's highest judicial tribunal, although in *Spano v. New York, supra,*[6] four of its members were of the view that the admission in evidence of such a confession denied due process. Nevertheless, the court based its reversal of Spano's conviction solely on the ground of testimonial compulsion.

Since the Supreme Court of the United States decided *Spano v. New York, supra,* the highest court of the state of New York held in two cases that, because of the absence of counsel, due process was denied by the admission in evidence of a confession made after indictment.[7] Both cases present the issue clearly, for in neither is there a suggestion of either physical or psychological coercion. In the first, *People v. DiBiasi,* 7 N. Y. (2d) 544, 166 N. E. (2d) 825, 200 N. Y. S. (2d) 21, the charge was murder in the

---

Fourteenth Amendment (*Malinski v. New York,* 324 U. S. 401, 412–418; *Rochin v. California,* 342 U. S. 165, 171, 172)." *People v. Spano,* 4 N. Y. (2d) 256, 266, 150 N. E. (2d) 226, 173 N. Y. S. (2d) 793, dissenting opinion per Desmond, J.

[6]"We do not have here mere suspects who are being secretly interrogated by the police as in *Crooker v. California, supra,* nor witnesses who are being questioned in secret administrative or judicial proceedings as in *In re Groban,* 352 U. S. 330, and *Anonymous Nos. 6 & 7 v. Baker, ante,* p. 287. This is a case of an accused, who is scheduled to be tried by a judge and jury, being tried in a preliminary way by the police. This is a kangaroo court procedure whereby the police produce the vital evidence in the form of a confession which is useful or necessary to obtain a conviction. They in effect deny him effective representation by counsel. This seems to me to be a flagrant violation of the principle announced in *Powell v. Alabama, supra,* that the right of counsel extends to the preparation for trial, as well as to the trial itself. . . ." *Spano v. New York,* 360 U. S. 315, 325, 3 L. Ed. (2d) 1265, 79 S. Ct. 1202, concurring opinion per Douglas, J.

"Let it be emphasized at the outset that this is not a case where the police were questioning a suspect in the course of investigating an unsolved crime. See *Crooker v. California,* 357 U. S. 433; *Cicenia v. Lagay,* 357 U. S. 504. When the petitioner surrendered to the New York authorities he was under indictment for first degree murder." *Spano v. New York, supra,* concurring opinion per Stewart, J.

[7]". . . Since, in addition, the express state constitutional and statutory provisions on right to counsel are not broad enough to cover the instant case, it is apparent that the substantial constitutional guarantee relied on by the court in reaching its decision was a due process right to counsel after indictment. . . ." 61 Colum. L. Rev. 744, 748.

first degree. Many commentators considered that the decision applied only to capital offenses,[8] but more recently in *People v. Waterman,* 9 N. Y. (2d) 561, 216 N. Y. S. (2d) 70, 74,[9] a conviction for grand larceny and assault was reversed for the same reason.

Had Self not taken the stand but stood upon his objection to the admission of the confession, I should favor reversal upon the authority of the two recent decisions of the highest court of New York; but this important question of jurisprudence need not now be decided because any invasion of the appellant's constitutional rights was waived when he voluntarily took the stand and testified to all of the facts related in his confession to the sheriff. *Wheeler v. United States,* 165 F. (2d) 225; *Huffstetler v. Texas,* 168 Tex. Crim. 16, 322 S. W. (2d) 624; *King v. State,* 156 Fla. 817, 24 So. (2d) 573; *People v. Combes,* 14 Cal. Reptr. 4, 363 P. (2d) 4; *Ross v. State,* 158 Miss. 827, 131 So. 367; *Weatherford v. State,* 164 Miss. 888, 143 So. 853; *Moya v. People,* 88 Colo. 139, 293 Pac. 335; *Hammonds v. Commonwealth,* 303 Ky. 680, 199 S. W. (2d) 133; *State v. Fouquette,* 67 Nev. 505, 221 P. (2d) 404; *State v. Ussery,* 357 Mo. 414, 208 S. W. (2d) 245; 5 Tex. Jur. (2d) 704, § 446.

---

December 21, 1961.  Petition for rehearing denied.

---

[8] 61 Colum. L. Rev. 744; 35 N. Y. U. L. Rev. 1594; 35 St. John's L. Rev. 154; 46 Va. L. Rev. 1468; 29 Fordham L. Rev. 393; 27 Brooklyn L. Rev. 24, 51; 9 Kan. L. Rev. 464.

[9] ". . . Since the finding of the indictment presumably imports that the People have legally sufficient evidence of the defendant's guilt of the crime charged (Code Crim. Pro., § 251), the necessities of appropriate police investigation 'to solve a crime, or even to absolve a suspect' cannot be urged as justification for any subsequent questioning of the defendant. See Spano v. New York, 360 U. S. 315, 323, 79 S. Ct. 1202, 1207, supra. Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *People v. Waterman,* 9 N. Y. (2d) 561, 216 N. Y. S. (2d) 70, 74.