[No. 39401.    Department One.    April 25, 1968.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM THOMAS BOWER, *Appellant*.*

*Camden M. Hall*, for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *James E. Deno*, for respondent.

*Reported in 440 P.2d 167.

Hale, J.—It is ·a terrible thing to aim a deadly weapon and demand of a person his money or his life, for the victim has reason to fear his assailant will take both. Knowing the evil nature of the deed and its legal consequences when proved, why then would one confess to it? Must we infer from the act of confessing that the accused spoke involuntarily, that his will to deny the crime or keep silent was overcome by force or the brutality, cleverness or deceit of the police? Or, are there other answers?

Does a man confess to a crime in expiation of guilt—to effect a kind of redemption? Is confession an act of atonement, lifting from the mind a burden put there by conscience? Does one confess to achieve peace of mind by balancing a good dead against the bad? Does confession serve in the mind of the accused to transfer his guilt to the police? or his victim? or society? In his conscience, does it purge him of guilt or make him less guilty, no matter how horrible and depraved the crime?

Could it be that one confesses to punish someone else, to wreak reprisal upon or incriminate an accomplice or perhaps some hated but innocent person? Does the accused, by confessing, hope to demonstrate his intelligence in yielding to the impelling logic of damning evidence? Or is it to strike a bargain? Does one confess because he thinks things will go better for him, that even though unpromised a reward will somehow be delivered to him?

Is the will to remain silent actually overcome by persistent police questioning so that the confession should be deemed involuntary even though no threats, force, fear or violence are employed to induce it? And how do we account for the confession of one who is clearly and demonstrably innocent? Whatever the reasons for the confession —many, varied and enigmatic as they may be—there probably exists in nearly everyone some inner compulsion for self-revelation. This is a case in point.

William T. Bower made a confession of armed robbery. He told the police in detail how he robbed Margaret Kreseck at gunpoint in her grocery store, fled the scene and got

home safely. At his trial, he moved to suppress certain incriminating admissions and the confession, claiming them to be inadmissible because they had been obtained from him in violation of his constitutional rights against self-incrimination.

Charged by information with armed robbery, found guilty by a jury, and sentenced to 20 years' maximum imprisonment, he appeals, specifying 11 assignments of error but consolidating them in argument.

Margaret Kreseck owned the California Food Center, a small grocery store in West Seattle. She had been robbed before, but this time she experienced an extraordinary fear. It was about 2:30 in the afternoon on October 11, 1966, and Mrs. Kreseck, alone in the grocery, was seated in a chair at the end of one of the counters when the defendant walked in, approached the counter, and asked if he might have a paper bag. She reached down behind the counter, got a small bag, and, putting it on the counter, said, "Will this do?" When she raised her eyes, she looked into the barrel of a gun pointed directly at her. Holding her at gunpoint, the man said, "That is just the right size. Now put your money in it."

She got a good look at him, testifying on that point:

> For about ten seconds I struggled to get out in a hurry words that I wanted to say about that I was tired of working twelve hours every day, six days a week, to have people come in and put guns on me, and take what I worked for. And he told me to just be quiet, step over to the cash register and put the money in the bag and I took a good look at him, and I was very—and I did exactly what I was told.

His appearance, she testified, became fixed in her mind:

> I was very, very frightened. He held that gun pointed at my stomach all of the time that he was in the store with his finger on the trigger, not on the guard, but on the trigger, and I have been held up at gunpoint before, but I never knew real fear until that day.

She said that she gave him the money as quickly as she could and testified as to what then happened:

He took the money and started to go out, and when he got — he had been standing right here, there is a separation here, and I was standing here in front of the cash register, and he stopped right here and with that gun pointed at my stomach he just stood there and looked at me for about, oh maybe, fifteen seconds. It is hard to tell the length of time. It seemed like fifteen years, but I know it wasn't, but, anyway, he just stood right here and looked at me, and I had the feeling that he was going to shoot. I looked away from his face and down at the gun. I waited for the bullet to come, and then he went over this far and then he still had the gun in his hand and between the scales and the cash register he shoved the gun through again and in a very calm voice he said, "You know the rules. Go back over and sit down and count to a slow fifty."

She said that she "heard a car rev its motor," ran out into the street, and could see the top of a car parked next to a nearby hedge and after it left the cover of the hedge noted that it was of a cream color.

The assailant's demeanor, appearance and mannerisms become relevant, not only as to his identity, but in the light of his later assertions that on the day of the robbery and the next day during his interrogation by the police he was under the influence of narcotic drugs.

Mrs. Kreseck said that during the whole episode there was nothing unusual about the robber's appearance, and, until he pointed the gun, she noted nothing strange in his behavior or demeanor. At all times he was calm and determined but polite. His politeness, however, did not assuage her fear. Later, in a police-conducted lineup and at the trial, she identified the defendant as the man who robbed her.

Somehow, in a way not clear from the record, someone reported to the Seattle police the description and license number of a cream-colored car in the vicinity of the Kreseck grocery, and the police traced to a William T. Bower, residing at Redmond, a town north of Seattle, the ownership of a car having the reported license number.

Thus, when two police officers went to the defendant's home next morning, they had only the slightest clues to the

robber they were seeking. Their leads consisted merely of Mrs. Kreseck's description of the man, a report of a cream-colored automobile seen in the vicinity, and the license number of a cream-colored car observed in the neighborhood of the grocery. The two officers had set out for Redmond with little likelihood that such slender clues would lead to anyone whom they could show had participated in or had knowledge of the robbery.

Detectives William E. Sands and Richard W. Reed of the Seattle Police Department's homicide-robbery detail, as we have seen, began their investigation by locating defendant's home address in Redmond from the license number. At a preliminary hearing to test the admissibility of defendant's admissions and confession, the officers testified that they went to Bower's home and he came to the door; that they identified themselves as police officers and asked Bower where his car had been the previous day. He replied that he had been working in the south end of Seattle and drove the car to his job and later traveled to Northgate in it, in the northern area of the city. According to this statement, Bower's car could not have been near the Kreseck grocery in West Seattle close to the time of the robbery. The officers said:

> We asked him if he would be willing to accompany us to the Seattle Police Department to take a polygraph in regards to his activities that day, and he readily stated, yes, he would go with us.

While traveling to the police station in the car, the officers said that they had another conversation with Bower concerning his whereabouts the previous day, and that he changed his story and acknowledged he had driven his car to West Seattle. He now said he had driven his car there about 5 p.m. to pay a bill at a West Seattle tire dealer's establishment. According to the officers' account of the conversation, he had not loaned his car to anyone on the day of the robbery, but did not admit participating in a robbery.

Detective Sands testified, and Detective Reed later corroborated that

When we got to the station, we informed him that he was now suspect of armed robbery in West Seattle, and I admonished him at that time and told him he was arrested and that he did not have to make any statements. Any statements that he made could be used against him in Court. He had a right to call an attorney or have an attorney present at any time statements were given.

Detective Sands said that he took the defendant to an interrogation room—a place wired for sound recording with concealed microphones—while he went to arrange a polygraph examination, but could not complete the arrangements because of the polygraph operator's absence. The detective testified that he returned to the interrogation room, again advised the defendant of his right to counsel, and that Bower said that he did not at that time want an attorney. He told Bower that his car had been seen leaving the scene of the robbery in West Seattle, and that Bower fit the description of the robber.

Thereupon, said the officers, Bower admitted the robbery; Bower, they said, stated that he had been driving around all over Seattle and Renton and Burien; pledged his tool box for gas money at a service station in Burien; drove to West Seattle; and entered a grocery store and asked a woman for a paper bag. When she gave it to him, he said, he showed her a gun and told her to put all of her money in the bag. He got into his car and removed the mechanic's clothing he had worn during the robbery. He then drove to the service station in Burien and redeemed his tool box. From there he went to the O.K. Tire Company in West Seattle where he paid a bill and then drove to his home in Redmond.

Officer Sands said this statement was made orally but recorded on a tape-recording machine. The officers also prepared a handwritten confession (plaintiff's exhibit No. 1), and one of them testified that, before presenting it to the defendant,

I advised him that he did not have to answer any questions, anything that he said could be used against him. He had the right to call an attorney and he had the right to have an attorney present, and also that if he

> didn't have the funds for an attorney, the Court would appoint an attorney for him. At that time, he stated he did not wish to have an attorney.

and that the defendant then signed the confession.

At a pretrial hearing held pursuant to RPPP 101.20W, RCW vol. 0, testing the admissibility of his confession and his earlier admissions, the defendant took the witness stand. Basing his challenge on a claim of temporary mental incompetency, he testified that his memory as to events before, en route to, and while in the police station on October 12, 1966, was hazy because he was in a state of what he described as narcotic hangover. That day and the preceding day, he said he had taken a quantity of pink and gray capsules known to him as "Speedies." He did not know the chemical composition of these drugs but took them to "more or less relieve me of all reality, just put me in a kind of a dream world-like." He had taken 10 Speedies at about 10 the morning of the interrogation, he said, and remembered being in the police station but did not remember anything clearly except for his incarceration.

On cross-examination, he recalled riding in the police car but said he could not remember later being advised of his right to remain silent or his right to counsel. He said that it took 24 to 36 hours for the pills to lose their effect and that he had no withdrawal symptoms other than loss of appetite and increased thirst. When under their effect, he said things go over one's head; they relieve one of responsibility that one does not want to accept. He said, "These pills will allow you to do what you want . . . they allow you to escape reality." He said he could not remember giving the officer the details of his actions on the day of the robbery or describing how he had driven to several different areas of the city. At no time did the defendant claim that the police had used any force, or violence, or put him in fear, or subjected him to any physical pain, or even discomfort, or made him any promises or threats. The officers testified that they saw nothing in Bower's demeanor, conduct or speech to indicate that he might be under the influence of drugs during any of the time they talked to him.

Following the hearing, the trial court ruled admissible the written and tape-recorded confession, and the statements made by the defendant to the police at his home and in the police car prior to the formal arrest. The court made written findings of both the disputed and undisputed facts and conclusions from the disputed facts, ruling that the mere failure to advise defendant that his statements to the police were being recorded did not render inadmissible the tape recording or the signed written confession.

■ Abundant evidence supported the finding that the tape-recorded oral confession and the typed and signed confession were made and signed by the defendant at the police station after he had been informed by the police that he was under arrest for robbery and had been warned of his constitutional rights against self-incrimination, of his right to counsel, and of his right to remain silent. Moreover, there was ample evidence to support the trial court's finding that no fear, force, threats or promises of reward were made by the police to induce the defendant to make and then sign the confession. The confession of one accused of crime is admissible against him only if it has been voluntarily made, without duress, fear or compulsion in its inducement. *United States v. Carignan*, 342 U.S. 36, 96 L. Ed. 48, 72 Sup. Ct. 97 (1951). If the confession is involuntary, it will be rejected. *Lynumn v. Illinois*, 372 U.S. 528, 9 L. Ed. 2d 922, 83 Sup. Ct. 917 (1963); *Haynes v. Washington*, 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963). Although the trial court need not make formal findings or write an opinion that the confession has been voluntarily made, a primary finding of voluntariness must appear in the record before the confession is admitted. *Sims v. Georgia*, 385 U.S. 538, 17 L. Ed. 2d 593, 87 Sup. Ct. 639 (1967).

Here, on substantial evidence, the court made formal written findings and conclusions that the defendant's confession had been voluntarily made and given without fear, force, threats or promises of reward to induce him to do so. The confession thus met the test of admissibility long

adhered to by this court, *i.e.*, voluntariness. If, under all the circumstances, it affirmatively appears that the defendant has voluntarily given a confession, it is admissible. *State v. Moore*, 61 Wn.2d 165, 377 P. 2d 456 (1963); *State v. Self*, 59 Wn.2d 62, 366 P.2d 193 (1961); *State v. Keating*, 61 Wn.2d 452, 378 P.2d 703 (1963); *State v. Carpenter*, 63 Wn.2d 577, 388 P.2d 537 (1964); *State v. Darst*, 65 Wn.2d 808, 399 P.2d 618 (1965); *State v. Gersvold*, 66 Wn.2d 900, 406 P.2d 318 (1965); *State v. Huston*, 71 Wn.2d 226, 428 P.2d 547 (1967); *State v. Piche*, 71 Wn.2d 583, 430 P.2d 522 (1967). Having found the confession to have been given voluntarily, the court properly admitted it.

Defendant urges too that his statements to the police made by him at his home and while en route to the police station were inadmissible under the fifth and sixth amendments to the federal constitution and similar provisions of the state constitution, citing, *inter alia*, mainly *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964); *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602 (1966); *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 Sup. Ct. 407 (1963); *Fay v. Noia*, 372 U.S. 391, 9 L. Ed. 2d 837, 83 Sup. Ct. 822 (1963); *Carnley v. Cochran*, 369 U. S. 506, 8 L. Ed. 2d 70, 82 Sup. Ct. 884 (1962), and the cases alluded to therein. We think, however, that the record discloses ample evidence to support the trial court's findings and conclusions that these statements were voluntarily made by the defendant while the investigation was in an investigatory stage before reaching its accusatory phase, and during a time when the defendant was not in custody. Therefore, the court properly admitted them in evidence as admissions against interest.

These preconfession statements were first made to Detectives Sands and Reed at the defendant's home when the defendant was requested to take a polygraph test. Later, while in the police car en route to take the polygraph test, he made statements inconsistent with and at variance with the first statements. The record supports the finding that all of these statements were voluntarily made while the defendant was speaking to the officers at his home and later

when he was voluntarily riding with and speaking to the officers in the police car.

At the pretrial confession hearing pursuant to RPPP 101.20W, RCW vol. 0, the defendant never denied that he accompanied the officers voluntarily; nor did he deny acceding to their request to proceed immediately with them to police headquarters for a polygraph test; nor did he deny that he voluntarily discussed with them his whereabouts on the day of the robbery. As with his confession, he attacks the admissibility of his admissions against interest for the asserted reason that he could not remember these conversations or events due to a condition he described as a narcotic hangover.

The officers, as we have noted, testified that Bower at all times from their first interview with him at his home until he signed the confession, appeared normal, physically and emotionally, and was cooperative. Not until he had changed his story about the places he had been on the day of the robbery did they believe that they had sufficient evidence to arrest him for robbery, and at that point they notified him he was under arrest for robbery and warned him of his rights against self-incrimination and to counsel.

We know of no rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation, to the police station or some other relevant place in furtherance of an investigation of a crime, or of any rule, for that matter, which forbids one to reject such request. But if the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and he is not in custody. In other words, he has not "been taken into custody or otherwise deprived of his freedom of action in any significant way . . . ." *Miranda v. Arizona, supra.*

Police departments constitute one component of the executive branch of government, and their conduct should not automatically be viewed by the courts with suspicion and

mistrust. A journey to the police station by witnesses, suspects or complainants, in the absence of explicit evidence of duress or proof of circumstances from which such duress must be inferred, should be regarded in much the same light as a journey to any other governmental office of the executive branch. The constant arching of the judicial eyebrows at the police and routine investigations conducted by them does little to advance the cause of civil liberty and much to endanger the public safety.

Of course, as has been suggested, a police station may in some degree be an inherently coercive environment, but it is also a place maintained by a democratic society at public expense for the transaction of governmental business. There is something inherently coercive, too, in many other places, public and private, such as the school classroom, military barracks, a factory or office—or a courtroom for that matter. Few are the places known to man where some physical or psychological forces are not at work to induce him to say what he would rather leave unsaid, or to leave unsaid what he would rather say. But the law ought not formulate or apply its rules in a given case upon unsupported assumptions or generally upon suspicion, innuendo and guesswork. Unless there is proof of force, fear or compulsion—an overt coercion or a direct duress or proof from which coercion should be inferred—the courts have no valid reason to suppress the truth by barring the admissions or confession.

There was no evidence here that the two officers did any more than state their business and request the defendant to go with them to the police station for a polygraph test. He acceded to their request to do both. His statements to them were made during that ride, during a time while he was not in custody and, therefore, not subject to warning of constitutional rights.

The courts are obliged to keep in mind that police stations in large cities are busy places. Innumerable persons go or are brought there voluntarily every hour of the day and night to report accidents, crimes, dangerous conditions and missing persons; to make complaints, seek protection,

recover lost or stolen property, and for countless other reasons—some genuine and substantial and others foolish, illusory and perhaps irrational. It may be that the person making the report or complaint is implicated in the offense, dereliction, or condition he is describing. He may, in hoping to escape the consequences, try to incriminate or transfer the culpability to others and voluntarily and freely supply the police with information which later proves damaging to the informant. That the information, report or comments are made in a police vehicle or in a police station in the presence of several police officers does not ipso facto establish a police custody. One is not in custody of the police unless it can be fairly said that his freedom of movement has been involuntarily curtailed by force or immediate threat of force from the police.

The admissibility of confessions and admissions against interest remains, as it always has been, a question of voluntariness, a matter of fact to be decided by the judge preliminarily and by the jury finally if the issue is put to them. From abundant evidence, the trial court found that the defendant voluntarily entered the police car for a trip to the police station and that, without coercion, he agreed to a polygraph test. The defendant was not in custody or under police duress or coercion when talking to the officers at his house before and during the trip to the police station in the police car. All of his statements during this interim, therefore, were voluntary. We think them properly admitted as voluntary admissions against interest.

One other point should be discussed. It concerns the defense of insanity. The only evidence offered by the defense in support of this plea was that the defendant had been taking barbiturates for about 2 months before the date of the robbery; that these drugs created a "narcotic hangover," and that they would "tranqualize his mind" and make a dream of reality. He said that the drug impaired his understanding and caused things to go over his head and allowed him to accept what he wanted to accept, hear what he wanted to hear, and believe what he wanted to believe.

He sought to support his plea of mental irresponsibility,

too, by the testimony of his wife who said that, before the crime, defendant was a little strange; that he tinkered with old cars, keeping some which did not run and selling others which did; that he began writing bad checks again; and that this led her to conclude he was not mentally responsible before the day of the crime and thereafter. The trial court removed the defense of insanity or mental irresponsibility from the jury's consideration to which error is assigned.

■ The issue of mental irresponsibility, under this evidence, was properly withdrawn from the case. A state of temporary insanity or mental irresponsibility induced by the voluntary act of the accused does not relieve him of criminal liability. To hold otherwise would allow one to steel his nerves, blanket his conscience, and fortify his resolve by taking drugs in preparation for a criminal enterprise. Thus, for good reason, this defense has been ruled out of the criminal law by statute.

RCW 10.76.010 provides:

> Any person who shall have committed a crime while insane, or in a condition of mental irresponsibility, and in whom such insanity or mental irresponsibility continues to exist, shall be deemed criminally insane within the meaning of this chapter. *No condition of mind induced by the voluntary act of a person charged with a crime shall be deemed mental irresponsibility within the meaning of this chapter.* (Italics ours.)

■ The only evidence of mental irresponsibility or insanity in the case showed that, if it existed in any degree at all, it had been induced by the voluntary and illegal acts of the defendant, *i.e.*, the taking of barbiturate drugs. Their effect upon his mind and personality could not be accepted as a defense to relieve him of culpability. *State v. Rio,* 38 Wn.2d 446, 230 P.2d 308 (1951). There being no evidence, then, of involuntary insanity, it was not an issue to submit to the jury. The plea of insanity or mental irresponsibility is an affirmative defense which must be pleaded in writing and proved by a preponderance of the evidence. *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957). If the

plea is unsupported by proof, it ceases to remain an issue in the case and should be withdrawn from the jury's consideration. *State v. Piche,* 71 Wn.2d 583, 430 P.2d 522 (1967).

We have examined the other assignments of error and, finding them to be without merit, affirm the judgment and sentence.

FINLEY, C. J., and WARD, J. Pro Tem., concur.

HILL and WEAVER, JJ., concur in the result.

July 8, 1968. Petition for rehearing denied.